Jose **LEDEZMA**, Appellant,

v.

**STATE of Iowa**, Appellee.

Nos. 99–1019.

Supreme Court of Iowa.

April 25, 2001.

W. Curtis Wiberg of Richard Rhinehart & Associates, Sioux City, for appellant.

Thomas J. Miller, Attorney General, Richard J. Bennett, Assistant Attorney General, Thomas S. Mullin, County Attorney, and James J. Katcher, Assistant County Attorney, for appellee.

CADY, Justice.

In this postconviction relief action, we are asked to find ineffective assistance of counsel in the trial of a case which resulted in a conviction for first-degree kidnapping and second-degree sexual abuse. The claim of ineffective assistance of trial counsel is based upon a variety of allegations, including inadequate trial preparation and denial of right to testify. The district court found trial counsel was ineffective, but found no resulting prejudice. On our review, we find the claim of ineffective assistance of counsel has been established. We reverse the decision of the district court and grant a new trial.

## I. Background Facts and Proceedings.

Jose Ledezma was born in Michoacan, Mexico, and illegally immigrated to the United States in 1990. He moved to Iowa in August of 1994, and began living in the Sioux City area just prior to the incident giving rise to this case. Jose completed approximately nine levels of education in Mexico, which is equivalent to a fifth grade education in the United States. He spoke only Spanish and did not understand the English language.

On August 13, 1994, Jose and his brother, Gonzalo, were arrested and subsequently charged with first-degree kidnapping and second-degree sexual abuse of a woman named Marie Big Bear. They had met Marie in a bar the previous night.

Jose and Gonzalo were appointed separate counsel following their arrest, as well as interpreters to assist in their cases. Christy Rice was appointed as an interpreter for Jose, while Ray Cota was appointed as an interpreter for Gonzalo. Notwithstanding, Cota was frequently used as an interpreter for Jose. Both Jose and Gonzalo waived a trial by jury, and their cases were consolidated for the pur-

poses of trial. The two men were held in jail prior to their trial. They were never informed by law enforcement officials or their attorneys of their right to contact the Mexican Consulate under Article 36 of the Vienna Convention on Consular Relations.

At trial, Marie and nine police officers were called as witnesses for the prosecution. Gonzalo did not testify and called no witnesses on his behalf. Jose also did not testify, and only called one witness for the purpose of establishing Marie's intoxicated condition.

The events leading to the convictions began in the early evening hours of August 12, 1994, when Jose, Gonzalo, and their cousin Sylvester Ledezma, began drinking beer at Jose and Gonzalo's apartment in Sioux City. They later went to the Western Tavern, a local bar, and continued drinking until the bar closed around 1:30 a.m. on August 13. While at the tavern, they met Marie Big Bear. Marie was also drinking beer. She also ingested methamphetamine while at the bar.

When the tavern closed, the patrons congregated outside. There was discussion about going to a house to continue drinking and socializing. Sylvester purchased a twelve-pack of beer from the tavern, and Marie left with the Ledezmas in their car. Gonzalo drove, Sylvester sat in the front passenger seat, and Jose and Marie were in the backseat.

Marie testified at the criminal trial that she thought the Ledezmas were taking her to the party that had been discussed. However, Gonzalo drove from the tavern to a local 7–Eleven convenience store. Jose remained in the backseat with Marie, while Gonzalo pumped the gas and Sylvester went inside the store to pay for the gas. Marie testified Jose placed her in a headlock to prevent her from leaving. Gonzalo then drove to Riverside Park, and

eventually stopped in an area named Fisherman's Road.

After Gonzalo parked the car, Marie left to go to the bathroom in the nearby bushes. She alleged that Jose followed her when she left the car, chased her when she attempted to run away, and subsequently forced her to have sexual intercourse. She further testified that after she returned to the car, Gonzalo and Sylvester, in that order, each forced her to engage in sexual intercourse with them. After Marie and Sylvester's sexual encounter, everyone returned to the car, and left Riverside Park. Marie was dropped off at her apartment after providing directions to the Ledezmas.

After arriving home, Marie called the police and provided them the license plate number of the Ledezma vehicle. Marie then called her ex-boyfriend, who is also the father of her son, Earl Rowley. Rowley was exercising visitation of the child and Marie was to have picked the boy up at Rowley's residence earlier in the evening. Marie told Rowley that she had not picked the boy up as planned because she had been raped. Marie failed to pick up their son from Rowley on several prior occasions, opting to party and drink instead.

Jose had planned to testify at the trial. However, after Earl Rowley was called to testify for Jose about the intoxicated condition of Marie on the night of the incident, Jose's trial counsel conferred with Jose and then informed the court that Jose would rest without testifying. The exchange between Jose and his attorney lasted approximately one minute.

The trial court found Jose guilty of first-degree kidnapping and second-degree sexual abuse. He was sentenced to life incarceration.

Jose appealed his conviction. He was represented by the State Appellate Defender's office. Jose informed his appellate counsel of his concerns regarding the effectiveness of his trial counsel. He also informed his appellate counsel about some alleged improprieties by Cota. His appellate counsel informed Jose that he could raise those issues later in a postconviction relief proceeding. His appeal was transferred to the court of appeals, which affirmed the conviction.

Jose then filed an application for postconviction relief. He alleged his appellate counsel was ineffective for failing to raise his claims of ineffective assistance of trial counsel on direct appeal. He further alleged his trial counsel was ineffective for failing to adequately investigate the case, to conduct proper cross-examination of witnesses, and to obtain a voluntary waiver of his right to testify. He also contended he was denied the effective assistance of an interpreter, and was not told of his right to consult the Mexican Consulate under the Vienna Convention.

At the postconviction hearing, Jose testified Marie consented to sexual intercourse. His version of the events of the morning of August 13, 1994, differed significantly from Marie's. Jose testified that neither he, Gonzalo, nor Sylvester told Marie they would take her to a party. Instead, Jose stated Marie left with them because she wanted to be with them. In addition, Jose disputed Marie's contention that he placed her in a headlock at the 7–Eleven store. Jose claimed he and Marie were kissing and hugging in the backseat while Gonzalo and Sylvester were outside the car at the store.

Jose further testified that Marie directed Gonzalo to drive the car to Fisherman's Road. He stated he did not follow Marie to the bushes when she left to go to the bathroom. He alleged that when Marie

returned to the car, she started kissing him, and led him to the bushes where she initiated sexual intercourse. Gonzalo testified at the postconviction hearing that Marie also consented to sexual intercourse with him. Although Sylvester's version of the incident is not in the record, Jose and Gonzalo both claimed at the postconviction hearing that Marie consented to sexual intercourse with Sylvester.

Jose also presented evidence that Cota convinced Martin Ledezma, a relative of the Ledezma brothers, to hire Cota to conduct an investigation prior to trial on behalf of Jose and Gonzalo. Cota falsely represented to Martin that he was licensed to do such work. In addition, Cota provided legal advice to Jose, Gonzalo, and Martin. Although the prosecution offered Jose several favorable plea bargains, Cota recommended Jose reject every offer, including one with a maximum imprisonment term of thirty-five years. Cota also counseled Jose that the prosecution had a weak case, and that deportation was the worst case scenario. Counsel for Jose never raised the issue of unethical interpreter conduct before the trial court, even though he believed Cota was possibly influencing Jose's decisions.

During his "investigation," Cota discovered information suggesting that the clerk at the 7–Eleven store during the early morning hours of August 13 did not observe any unusual behavior inside the Ledezma car. Although Cota shared this information with Jose's trial counsel, counsel did not investigate it further. In fact, Jose's trial counsel did little or no investigative work in preparation for trial. He did not visit the Western Tavern to interview bar patrons, bartenders, or waitresses who may have seen Marie and Jose the night of August 12, and he did not interview any workers or customers at the 7–Eleven to determine if they had seen the Ledezmas or their car that morning. In addition, Jose's trial counsel never notified Jose of his right to consular access under the Vienna Convention during the representation.

Jose's trial counsel acknowledged at the postconviction relief hearing that Jose intended to testify at the trial that he engaged in sexual intercourse with Marie but that it was consensual. Through a pretrial interview with Jose, Jose's trial counsel learned that Jose had only lived in the area a few weeks and was not familiar with Riverside Park. Jose told his trial counsel that Marie had acted friendly to him in the bar and she wanted to leave with the three men after the bar closed. Jose also told his trial counsel that Marie guided the three men to the park and voluntarily engaged in sexual intercourse with them. Jose also told his trial counsel that Marie was intoxicated to the point that the bartender had stopped serving her.

Jose's trial counsel acknowledged that he had intended to call Jose to testify at the trial and was prepared to call Jose as a witness. However, Jose's trial counsel testified at the postconviction relief hearing that just minutes before Jose was to testify late in the afternoon of the second day of trial, Jose revealed some potentially damaging evidence to him. His trial counsel said Jose told him, for the first time, that Sylvester had asked Jose at some point during the evening to drive him some place so he could have sexual intercourse with Marie. His trial counsel immediately felt this evidence, if revealed to the trial court, would support a conviction for kidnapping. Accordingly, he promptly advised Jose of the dire consequences if he testified, and further advised him not to do so. The entire exchange between Jose and his trial counsel lasted only a minute or so, and the trial court recessed court for the day after Jose's trial counsel rested.

.

The postconviction court found the colloquy at trial between Jose and his trial counsel did not result in a knowing and voluntary waiver by Jose of his right to testify. In addition, the court found Jose's trial counsel was ineffective for failing to investigate whether a store clerk at the 7–Eleven convenience store witnessed Jose and Marie in the vehicle, and was ineffective for failing to notify Jose of his right to consular access under Article 36 of the Vienna Convention. Lastly, the court determined Cota stepped outside the bounds of his duties as an interpreter and interfered with Jose's relationship with his trial counsel. However, the court held Jose was not prejudiced by these numerous breaches and denied postconviction relief.

Jose appeals. He argues the district court erroneously held that he was not individually prejudiced by each act of misconduct of Cota and his trial counsel. He claims the court used an improper standard of prejudice. Additionally, Jose alleges the district court erred in not finding that the combined effect of the irregularities of his interpreter and trial counsel, including the failure to provide him with access to his government consulate, was prejudicial.

## II. Scope of Review.

We typically review postconviction relief proceedings on error. *Osborn v. State*, 573 N.W.2d 917, 920 (Iowa 1998). However, when the applicant asserts claims of a constitutional nature, our review is de novo. *Id.* Thus, we review claims of ineffective assistance of counsel de novo. *State v. Oetken*, 613 N.W.2d 679, 683 (Iowa 2000); *State v. Carrillo*, 597 N.W.2d 497, 499 (Iowa 1999); *State v. Mapp*, 585 N.W.2d 746, 747 (Iowa 1998); *Osborn*, 573 N.W.2d at 920. In addition, we give weight to the lower court's findings concerning witness credibility. Iowa

R.App. P. 14(f)(7); *Taylor v. State*, 352 N.W.2d 683, 687 (Iowa 1984).

## III. Preservation of Applicant's Claims.

The State correctly notes Jose did not raise any of the claims asserted in his application for postconviction relief on direct appeal. Generally, a claim not raised on direct appeal cannot be raised in a postconviction relief proceeding unless the applicant can demonstrate a sufficient cause or reason for not properly raising the issue previously. Iowa Code § 822.8 (1995); *Berryhill v. State*, 603 N.W.2d 243, 245 (Iowa 1999); *Osborn*, 573 N.W.2d at 921; *Washington v. Scurr*, 304 N.W.2d 231, 234 (Iowa 1981). The applicant must also prove he was actually prejudiced by the alleged error. *Berryhill*, 603 N.W.2d at 245; *Osborn*, 573 N.W.2d at 921; *Polly v. State*, 355 N.W.2d 849, 856 (Iowa 1984). To prove prejudice, the applicant must show that the alleged error actually and substantially disadvantaged him. *Polly*, 355 N.W.2d at 855.

We have found the ineffective assistance of appellate counsel to constitute a sufficient reason for failing to raise the issue of ineffective assistance of trial counsel on direct appeal. *Berryhill*, 603 N.W.2d at 245; *Polly*, 355 N.W.2d at 855; *Washington*, 304 N.W.2d at 235. We judge ineffective assistance of appellate counsel claims against the same two-pronged test utilized for ineffective assistance of trial counsel claims. *Osborn*, 573 N.W.2d at 922. To prove appellate counsel's deficient performance resulted in prejudice, the applicant must show his ineffective assistance of trial counsel claim would have prevailed if it had been raised on direct appeal. Thus, before we can determine whether error has been preserved, we must analyze the merits of

Jose's ineffective assistance of counsel claims.

## IV. Ineffective Assistance of Counsel.

### A. Overview of the Law Governing Ineffective Assistance of Counsel Claims.

■■■■ To prevail on a claim of ineffective assistance of counsel, the applicant must demonstrate both ineffective assistance and prejudice. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693 (1984); *Oetken,* 613 N.W.2d at 683; *State v. Artzer,* 609 N.W.2d 526, 531 (Iowa 2000); *State v. Risdal,* 404 N.W.2d 130, 131–32 (Iowa 1987). Both elements must be proven by a preponderance of the evidence. *State v. Ramirez,* 616 N.W.2d 587, 593 (Iowa 2000); *Oetken,* 613 N.W.2d at 683; *Carrillo,* 597 N.W.2d at 499; *State v. Wissing,* 528 N.W.2d 561, 563 (Iowa 1995); *State v. Tracy,* 482 N.W.2d 675, 679 (Iowa 1992); *State v. Johnson,* 604 N.W.2d 669, 673 (Iowa Ct.App.1999). However, both elements do not always need to be addressed. If the claim lacks prejudice, it can be decided on that ground alone without deciding whether the attorney performed deficiently. *Strickland,* 466 U.S. at 697, 104 S.Ct. at 2069, 80 L.Ed.2d at 699; *Wissing,* 528 N.W.2d at 564; *State v. Bumpus,* 459 N.W.2d 619, 627 (Iowa 1990); *Taylor v. State,* 352 N.W.2d 683, 685 (Iowa 1984).

### 1. Deficient Performance Component.

■■■■ To establish the first prong, the applicant must demonstrate the attorney performed below the standard demanded of a reasonably competent attorney. *Strickland,* 466 U.S. at 688, 104 S.Ct. at 2064–65, 80 L.Ed.2d at 693–94; *Artzer,* 609 N.W.2d at 531; *State v. Lockheart,* 410 N.W.2d 688, 695 (Iowa Ct.App.1987).

Thus, we measure the attorney's performance against "prevailing professional norms." *Strickland,* 466 U.S. at 688, 104 S.Ct. at 2065, 80 L.Ed.2d at 694; *Risdal,* 404 N.W.2d at 132. As such, we begin with the presumption that the attorney performed competently. *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065, 80 L.Ed.2d at 694–95; *Oetken,* 613 N.W.2d at 683; *State v. Westeen,* 591 N.W.2d 203, 210 (Iowa 1999); *Risdal,* 404 N.W.2d at 131. Moreover, we avoid second-guessing and hindsight. *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065, 80 L.Ed.2d at 694; *Caldwell,* 494 N.W.2d at 215; *Burgess v. State,* 585 N.W.2d 846, 847 (Iowa Ct.App.1998). Instead, we scrutinize each claim in light of the totality of the circumstances. *Strickland,* 466 U.S. at 688, 104 S.Ct. at 2064–65, 80 L.Ed.2d at 693–94; *Artzer,* 609 N.W.2d at 531; *Lockheart,* 410 N.W.2d at 695. In the end, the inquiry is transformed into an individualized fact-based analysis. *Williams v. Taylor,* 529 U.S. 362, 391, 120 S.Ct. 1495, 1512, 146 L.Ed.2d 389, 416 (2000).

Claims of ineffective assistance of counsel can arise from most any stage in the criminal proceedings, and can involve most any action or inaction of counsel. 3 Wayne R. LaFave et al., *Criminal Procedure* § 11.10(c), at 714 (2d ed.1999) (citing J. Burkhoff & H. Hudson, *Ineffective Assistance of Counsel* §§ 6.02, 8.01 (1998)) [hereinafter LaFave]. Thus, claims can center, as in this case, on both the failure to investigate and advising a defendant against exercising the right to testify.

Considering the standard of reasonableness utilized in determining ineffective assistance claims, ineffective assistance is more likely to be established when the alleged actions or inactions of counsel are attributed to a lack of diligence as opposed to the exercise of judgment. *Id.* Clearly, there is a greater tendency for courts to

find ineffective assistance when there has been "an abdication–not an exercise–of ... professional [responsibility]." *McQueen v. Swenson*, 498 F.2d 207, 216 (8th Cir.1974). Miscalculated trial strategies and mere mistakes in judgment normally do not rise to the level of ineffective assistance of counsel. *Wissing*, 528 N.W.2d at 564; *Caldwell*, 494 N.W.2d at 214. Thus, claims of ineffective assistance involving tactical or strategic decisions of counsel must be examined in light of all the circumstances to ascertain whether the actions were a product of tactics or inattention to the responsibilities of an attorney guaranteed a defendant under the Sixth Amendment. 3 LaFave § 11.10(c), at 716.

On the other hand, a decision by counsel based upon tactical judgment does not completely immunize the decision from an ineffective assistance challenge. *Id.* at 717. While strategic decisions made after "thorough investigation of law and facts relevant to plausible options are virtually unchallengeable," strategic decisions made after a "less than complete investigation" must be based on reasonable professional judgments which support the particular level of investigation conducted. *Strickland*, 466 U.S. at 690–91, 104 S.Ct. at 2066, 80 L.Ed.2d at 695. The accompanying investigation must be reasonable under the circumstances. *See id.* at 691, 104 S.Ct. at 2066, 80 L.Ed.2d at 695. Moreover, there can be a point when the tactical or strategic decisions made by counsel from a host of competing options fall outside the broad scope of a reasonably competent attorney.

### 2. Prejudice Component.

Once the applicant proves ineffective assistance, it must also be shown that the error caused prejudice. *Strickland*, 466 U.S. at 693, 104 S.Ct. at 2067, 80 L.Ed.2d at 697; *Westeen*, 591 N.W.2d at 211. To sustain this burden, the applicant must demonstrate "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068, 80 L.Ed.2d at 698; *see Artzer*, 609 N.W.2d at 531; *Tracy*, 482 N.W.2d at 680. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068, 80 L.Ed.2d at 698; *see Wissing*, 528 N.W.2d at 564; *Bumpus*, 459 N.W.2d at 627.

In defining this prejudice prong in *Strickland v. Washington*, the Supreme Court rejected the claim by the defendant that prejudice was established when the attorney's unprofessional errors resulted in a mere impairment of the presentation of the defense. *Strickland*, 466 U.S. at 693, 104 S.Ct. at 2067–68, 80 L.Ed.2d at 697. It found that if such a standard were adopted, every criminal defense attorney would be subjected to a successful ineffective assistance claim, as every error by counsel would conceivably impair a defense. *Id.*

On the other hand, the Court did not want the standard to be so stringent that no defendant could ever satisfy the prejudice prong. Thus, the Court also rejected the stringent outcome-determinative test of requiring a defendant to "show that counsel's deficient conduct more likely than not altered the outcome in the case." *Id.* at 693, 104 S.Ct. at 2068, 80 L.Ed.2d at 697. Instead, the Court crafted the governing question to be "whether there is a reasonable probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilt." *Id.* at 695, 104 S.Ct. at 2068, 80 L.Ed.2d at 698. To satisfy this requirement, an applicant must meet "the burden of showing that the decision reached would reasonably likely

have been different absent the errors." *Id.* at 696, 104 S.Ct. at 2069, 80 L.Ed.2d at 699.

In explaining the application of the prejudice standard, the Court stressed that the ultimate concern should be the overriding fundamental fairness of the proceeding. *Id.* Yet, this concern over fundamental fairness does not serve to supplement the prejudice inquiry except in those instances where a defendant attempts to demonstrate prejudice by urging considerations that do not deprive the defendant of substantive or procedural rights recognized under the law. *Williams,* 529 U.S. at 392–93, 120 S.Ct. at 1513, 146 L.Ed.2d at 417–18. In those cases where the performance of counsel does deprive a defendant of a procedural or substantive right recognized in the law, the straightforward prejudice test pronounced in *Strickland* guides the analysis. *Id.* at 391, 120 S.Ct. at 1512–13, 146 L.Ed.2d at 417–18.

We first defined the standard for determining whether a defendant has demonstrated the requisite prejudice in *State v. Miles,* 344 N.W.2d 231, 234 (Iowa 1984). In *Miles,* we interpreted the prejudice prong to require a defendant to prove his attorney's error "worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Miles,* 344 N.W.2d at 234 (quoting *United States v. Frady,* 456 U.S. 152, 170, 102 S.Ct. 1584, 1596, 71 L.Ed.2d 816, 832 (1982)). However, *Miles* was issued prior to the Supreme Court's pronouncement in *Strickland v. Washington.* Moreover, *Miles* relied upon the Fifth Circuit case, *Washington v. Strickland,* 693 F.2d 1243 (5th Cir.1982), *rev'd,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), in forming its definition of prejudice, which case was subsequently reversed by the Court in its *Strickland* decision.

We have never disavowed our analysis of the prejudice prong set forth in *Miles.* Instead, we have labeled that interpretation "an actual prejudice standard," finding it to be the same standard adopted in *Strickland. State v. Propps,* 376 N.W.2d 619, 623 (Iowa 1985). However, in *Taylor v. State,* 352 N.W.2d 683, 685 (Iowa 1984), we expressly adopted the "reasonable probability of a different result" test articulated in *Strickland* for analyzing resultant prejudice. *See Propps,* 376 N.W.2d at 623; *Mark v. State,* 370 N.W.2d 609, 612 (Iowa Ct.App.1985). Since *Taylor,* we have applied the *Strickland* test as the appropriate prejudice standard. *See Artzer,* 609 N.W.2d at 531; *Carrillo,* 597 N.W.2d at 500; *Wissing,* 528 N.W.2d at 564; *Tracy,* 482 N.W.2d at 680; *State v. Hill,* 449 N.W.2d 626, 628 (Iowa 1989); *Risdal,* 404 N.W.2d at 132; *Propps,* 376 N.W.2d at 623. The fundamental fairness of the proceedings is not utilized by our courts as the standard, unless it fits into one of those unique situations described in *Williams v. Taylor. See Wanatee v. Ault,* 101 F.Supp.2d 1189, 1197 (N.D.Iowa 2000). Although we have at times considered the fundamental fairness of the proceeding, we believe the reasonable probability of a different result is our governing inquiry.

In applying this standard it is also necessary to consider what is meant by a different "result." *Strickland* seemed to define result as the decision rendered. *Strickland,* 466 U.S. at 696, 104 S.Ct. at 2069, 80 L.Ed.2d at 699. Many courts also interpret result in the same manner, requiring a showing of the reasonable probability of a different verdict, or that the fact finder would have possessed reasonable doubt. *See Abdur'Rahman v. Bell,* 226 F.3d 696, 707 (6th Cir.2000); *Montoya v. Johnson,* 226 F.3d 399, 408 (5th Cir.2000); *Espy v. State,* 246 Ga.App. 1, 539 S.E.2d 513, 516 (2000); *Watson v. State,* 243 Ga. App. 636, 534 S.E.2d 93, 96 (2000); *Vogel*

*v. State*, 31 S.W.3d 130, 136 (Mo.Ct.App. 2000); *McAllister v. State*, 28 S.W.3d 72, 76 (Tex.App.2000); *Burruss v. State*, 20 S.W.3d 179, 186 (Tex.App.2000). We believe this is how "result" should be interpreted in Iowa, and how it has most often been interpreted. *See Westeen*, 591 N.W.2d at 211; *Tracy*, 482 N.W.2d at 680; *Bumpus*, 459 N.W.2d at 627; *Hill*, 449 N.W.2d at 629; *Taylor*, 352 N.W.2d at 686; *see also Wanatee*, 101 F.Supp.2d at 1197–98; *Burgess*, 585 N.W.2d at 847.

Finally, it is important to observe that *Strickland* defines the legal standard to govern the prejudice component of a claim for ineffective assistance of counsel. *Strickland* establishes that prejudice exists when "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068, 80 L.Ed.2d at 698. This standard does not modify our requirement for the defendant to establish the elements of a claim for ineffective assistance of counsel by a preponderance of the evidence. *See Oetken*, 613 N.W.2d at 683; *Carrillo*, 597 N.W.2d at 499; *Wissing*, 528 N.W.2d at 563. Instead, in making the decision whether there is a reasonable probability that the result of the trial would have been different, the burden of proof is on the defendant to establish this standard by a preponderance of the evidence. With this in mind, we now apply these concepts to the specific claims raised in this case.

### B. Applicant's Specific Ineffective Assistance of Counsel Claims.

We first consider the ineffective assistance claims alleged against Jose's trial counsel. If we find Jose does not establish a sufficient ineffective assistance claim against his trial counsel, we need not address his ineffective assistance of appellate counsel claim.

### 1. The Failure to Investigate.

Counsel is required to conduct a reasonable investigation or make reasonable decisions that make a particular investigation unnecessary. *Strickland*, 466 U.S. at 691, 104 S.Ct. at 2066, 80 L.Ed.2d at 695. Thus, the duty to investigate is not unlimited, and trial counsel is not required to interview every potential witness. *Heaton v. State*, 420 N.W.2d 429, 431 (Iowa 1988). There is no need to investigate a particular matter, for example, if the defendant has given counsel a reason to believe the investigation would be fruitless or unwarranted. *Strickland*, 466 U.S. at 691, 104 S.Ct. at 2066, 80 L.Ed.2d at 695; *Mulligan v. Kemp*, 771 F.2d 1436, 1441–42 (11th Cir.1985). Similarly, investigation of a defense may be curtailed or eliminated if the facts are already known to counsel through another source. *See Mulligan*, 771 F.2d at 1442–43. In each instance, the decision to investigate a particular matter must be judged in relationship to the particular underlying circumstances. *Strickland*, 466 U.S. at 691, 104 S.Ct. at 2066, 80 L.Ed.2d at 695; *Chambers v. Armontrout*, 907 F.2d 825, 828 (8th Cir.1990); *see Schrier v. State*, 347 N.W.2d 657, 662 (Iowa 1984) ("[t]he extent of the investigation required in each case turns on the peculiar facts and circumstances").

In this case, Jose claims his trial counsel breached an essential duty by failing to investigate and interview the 7–Eleven store clerk and by failing to investigate potential witnesses from the Western Tavern. To analyze this claim, it is important to consider the pretrial background of the case. The evidence against Jose essentially came from Marie. Jose told his attorney he and Marie went to the secluded

area and engaged in sexual intercourse, but maintained his and her actions were voluntary. Consequently, the defense developed by trial counsel centered on consent. Counsel acknowledged this defense was a fact question dependent upon the credibility of the witnesses.

Notwithstanding, trial counsel testified he did not interview any employees or patrons of the bar. The reason he believed the investigation was unnecessary was because Marie had acknowledged she voluntarily left the bar with the three men after it closed. Thus, he claimed the information sought by any investigation was known and undisputed. On the other hand, he did not offer an explanation for not attempting to locate the store clerk, despite knowing that the clerk could have testified to observing no unusual behavior while Marie and the three men were at the store.

Although the evidence uniformly showed Marie voluntarily left the bar with the three men, the important question in the case centered on the reason she left with the men. An investigation of the patrons and employees of the bar could have helped flush out Marie's claim that she thought the men were taking her to someone's home for an after-bar party. More importantly, Jose had told his attorney that Marie was acting very friendly towards the three men at the bar, and made some statements to others that she wanted to go with them. While a reasonable attorney under the circumstances may not have investigated the witnesses at the tavern for the purpose of determining whether Marie voluntarily left with the men, there were serious questions concerning the reason she voluntarily left which demanded investigation.

Furthermore, the justification offered by trial counsel for failing to interview the bar patrons and employees cannot extend to failing to interview the 7–Eleven store clerk. By the time Marie and the three men arrived at the 7–Eleven store, Marie claimed her presence in the car was no longer voluntary. Thus, an investigation was absolutely necessary. Moreover, trial counsel was aware such an investigation could have been helpful to Jose's case.

Based on the information provided to trial counsel, Jose essentially had a single defense—consent. Trial counsel, however, failed to conduct even a minimal investigation to support this defense. Under these circumstances, trial counsel's pretrial investigation was unreasonable. *See Workman v. Tate*, 957 F.2d 1339, 1345–46 (6th Cir.1992) (failure of counsel to locate and interview only witnesses that could support defendant's defense); *Blackburn v. Foltz*, 828 F.2d 1177, 1182–83 (6th Cir. 1987) (failure to interview sole alibi witness). The failure to investigate the only reasonable and realistic defense rendered trial counsel's assistance ineffective. *Chambers*, 907 F.2d at 830 (citing *Code v. Montgomery*, 799 F.2d 1481, 1483 (11th Cir.1986)).

### 2. Failure to Testify.

A defendant has a constitutional right to testify at a criminal trial. *Rock v. Arkansas*, 483 U.S. 44, 51, 107 S.Ct. 2704, 2708, 97 L.Ed.2d 37, 46 (1987). Moreover, it is a fundamental right that can only be waived by the defendant, which can only be done voluntarily, knowingly, and intelligently. *Foster v. Delo*, 11 F.3d 1451, 1457 (8th Cir.1994). The decision whether or not to testify belongs to the defendant, and the role of counsel is to provide advice to enable a defendant to make the decision. *See Taylor*, 352 N.W.2d at 687–88.

Counsel has a duty to advise the defendant about the consequences of

testifying so that an informed decision can be made. *See id.* The decision is often extremely difficult to make, but "can be the single most important factor in a criminal case." *Boyd v. United States,* 586 A.2d 670, 673 (D.C.1991). Generally, the advice provided by counsel is a matter of trial strategy and will not support a claim of ineffective assistance absent exceptional circumstances. However, when a defendant follows the misinformed advice of counsel concerning the consequences of testifying, ineffective assistance of counsel may occur. *See Foster,* 11 F.3d at 1457 (counsel misinformed defendant of the risks of testifying and failed to inform defendant of the benefits); *Blackburn,* 828 F.2d at 1181–82 (counsel misinformed defendant that government could use prior convictions if defendant testified). *But see Rogers–Bey v. Lane,* 896 F.2d 279, 283 (7th Cir.1990) (counsel's advice to defendant not to testify based on erroneous belief that prior convictions could be used to impeach was still reasonable where counsel advanced other reasonable grounds for not testifying).

There may be numerous reasons to support the advice by counsel to a defendant not to testify. *See, e.g., Schrier,* 347 N.W.2d at 663–64 (counsel did not want to jeopardize expected verdict of acquittal); *People v. Reed,* 57 Ill.App.3d 533, 15 Ill. Dec. 192, 373 N.E.2d 538, 543–44 (1978) (belief that prosecution failed to establish guilt beyond a reasonable doubt and that defendant would not make a good witness based on simulated examination and a prior false statement made by the defendant). In this case, trial counsel intended to call Jose to testify, but changed his mind just prior to the planned testimony and advised Jose that it would be bad for him to testi-

fy. Trial counsel gave this advice after learning from Jose that Sylvester told him he intended to have sexual intercourse with Marie and wanted Jose to drive him some place so he could do so.[1] Trial counsel believed this revelation supported the specific intent to subject the victim to sexual abuse element of the kidnapping charge. *See* Iowa Code § 710.1 (there are five alternatives to the intent element of kidnapping, including the intent to subject the person to sexual abuse).

While the reason for the advice given by trial counsel not to testify falls within the parameters of trial strategy, trial counsel failed to gather all of the necessary information about Jose's revelation and failed to advise Jose of the consequences of not only testifying, but also the consequences of not testifying. Jose was only told by his trial counsel that it would be bad to testify.

It is important to recognize that trial counsel only learned from this last minute disclosure that Sylvester wanted Jose to drive him some place so he could engage in sexual intercourse with Marie. However, Jose gave no further indication to his trial counsel whether or not Sylvester was talking about consensual or nonconsensual intercourse. Trial counsel arrived at a conclusion without gathering all the necessary facts. Clearly, Marie's intentions regarding sexual intercourse were as important as those of Jose and the other two men. If Sylvester's intentions were to engage in consensual intercourse, the last minute revelation to trial counsel would not be adverse to Jose's defense. Moreover, any damage caused by the last minute revelation would have only been cumulative to Marie's testimony. *See Chambers,* 907 F.2d at 831 ("damaging testimony was merely cumulative of . . . the State's wit-

---

**1.** At the postconviction relief hearing, however, Jose denied telling his trial counsel that he, Gonzalo, or Sylvester ever talked about

taking Marie some place to have sexual intercourse.

nes[s'] testimony"). Marie had already testified Jose placed her in a headlock and forcibly transported her to the area where the sexual intercourse occurred.

Moreover, trial counsel did not only fail to explain the consequences of testifying, he failed to explain the consequences of not testifying. Marie's testimony at trial established all the elements of the crimes of kidnapping and sexual abuse, and trial counsel acknowledged she made a good witness at trial. Without any witness to challenge her testimony due to the lack of pretrial investigation, Jose's own testimony was his only real chance to assert a defense. When Jose followed the advice of his counsel, he lost his opportunity to present his side of the story in a case which essentially came down to the credibility of one of two stories. Under the circumstances, trial counsel performed deficiently.

### 3. Prejudice.

▆▆ When the performance of counsel relates to the failure to present evidence, we must consider what bearing the evidence may have had on the outcome of the case. If trial counsel would have investigated the 7–Eleven store clerk in this case, he would have discovered a witness who could have disputed Marie's contention that she was held in a headlock while at the store, or at least could have produced testimony that nothing unusual was observed. More importantly, if Jose would have testified, he could have offered his side of the story. This testimony would have not only included Jose's version of the voluntary nature of his encounter with Marie, but evidence that the men were very new to the area and unlikely aware of the location of the park and the secluded area where the sexual intercourse occurred. This testimony would have been consistent with Jose's claim that Marie provided directions to the park. Additionally, the fact finder would have heard that Marie was acting very friendly towards the men prior to leaving the bar with them, and made inviting statements to them.

Although Marie was a credible witness on the witness stand, the corroborative evidence offered by the State to support her testimony was essentially limited to some minor redness or bruising on her back, neck, and chest, and observations by police officers of the matted-down grass in the area where the sexual intercourse occurred. Yet, this same evidence is not inconsistent with Jose's version of the events.

Considering the combined effect of both errors by counsel, we conclude by a preponderance of the evidence that there is a reasonable probability the result of the trial would have been different if the errors would not have occurred. Once counsel failed to investigate, the presentation of Jose's version of events became critical to a defense. When both failed to occur, Jose was essentially provided with no defense at all. The fact finder only had Marie's story to apply to the elements of the crime.

We recognize the prejudice standard is perhaps more easily stated than applied. It is, of course, difficult to discern whether a reasonable probability exists that the result of a trial would have been any different without ineffective assistance of counsel. Yet, the nature of the ineffective assistance as well as the nature and strength of the evidence produced by the State at trial are important factors in making this decision. *See State v. Bayles,* 551 N.W.2d 600, 610 (Iowa 1996) (no prejudice could result from counsel's alleged deficient performance as the evidence of defendant's guilt was overwhelming); *Bumpus,* 459 N.W.2d at 627 (same). It becomes easier to doubt the fundamental fairness of a trial, and to question the

reliability of the verdict, when the evidence by the State is not overwhelming and the errors by counsel are significant. Here, the evidence which counsel failed to produce at trial would have challenged the very core of the State's case, and, when considered, tends to put the State's case in a much different light. Moreover, the ineffective assistance regarding the right to testify impacted a fundamental right. The importance of this right was heightened when the evidence of guilt primarily centered on a single witness. Under the circumstances, our confidence in the outcome of the trial is undermined when we consider it concluded without an opportunity for the fact finder to hear the accused's version of the events. The fundamental fairness in a trial which would take place without such evidence becomes clouded in doubt. If both sides of this case would have been presented, we believe it is at least reasonably probable that the fact finder would have found reasonable doubt.

Because we find Jose was prejudiced by his trial counsel's deficient performance in failing to conduct investigative work in support of Jose's defense and to permit Jose to testify, we need not determine whether the remainder of Jose's ineffective assistance claims have merit. Thus, we will not address Jose's claims involving his waiver of a jury trial and his trial counsel's cross-examinations and trial preparation. However, we will discuss Jose's ineffective assistance of interpreter and the right to consular access claims because of their potential impact on criminal defense attorneys representing foreign national clients.

### 4. Ineffective Assistance of Interpreter.

Trial counsel may breach a duty owed to his client through the ineffective assistance of an interpreter. When an intermediary, such as an interpreter, is the only means of communication for a defendant and his attorney, any deficient conduct on the part of the intermediary can be imputed to the attorney as ineffective assistance. *Chacon v. Wood,* 36 F.3d 1459, 1464 (9th Cir.1994). Inaccurate and incomplete translations of attorney-client communications by an interpreter are an example of deficient conduct by an intermediary giving rise to an ineffective assistance of trial counsel claim. *Id.* at 1464–65.

As Jose's primary interpreter, Ray Cota was Jose's main channel of communication with his trial counsel. Cota abused his powers as an officer of the court by acting outside the scope of his duties as a court-appointed interpreter. He falsely held himself out to be a licensed private investigator, accepting money from Martin Ledezma to "investigate" Jose and Gonzalo's cases. Cota interfered with the attorney-client relationship by directly answering Jose's questions concerning the case instead of communicating the inquiries to trial counsel. In addition, Cota provided extensive legal advice to Jose, telling him the prosecution's case was "weak" because it did not have sufficient evidence for a conviction. Cota also convinced Jose he could arrange for Jose's deportation to Mexico, claiming he had a special relationship with the court.

Although it is not necessary for us to decide whether Cota's conduct may be imputed to trial counsel in this case, we do not condone such misconduct by court-appointed interpreters. Interpreters engaging in similar conduct may, in essence, deprive defendants of their constitutional right to an interpreter. *See Ko v. United States,* 722 A.2d 830, 834 (D.C.1998); *State v. Gonzales–Morales,* 138 Wash.2d 374, 979 P.2d 826, 828 (1999). Without a competent and impartial interpreter to assist defendants in their understanding of crimi-

nal proceedings, defendants will be unable to adequately confront witnesses or present a defense. *See Chacon,* 36 F.3d at 1464; *Ko,* 722 A.2d at 834; *Aleman v. State,* 957 S.W.2d 592, 594 (Tex.App.1997); *Gonzales–Morales,* 979 P.2d at 828. This could have serious consequences, and may constitute grounds for postconviction relief even if counsel's performance was otherwise effective. *See Chacon,* 36 F.3d at 1464.

### 5. The Right to Consular Access under Article 36 of the Vienna Convention on Consular Relations.

The postconviction court found trial counsel breached another essential duty when he failed to inform Jose of his right to consular access under Article 36 of the Vienna Convention. In fact, the court found Article 36 conferred a private enforceable right on Jose to contact the Mexican Consulate officials once he was detained by the Sioux City police. We do not decide today whether the Convention actually creates an individual right to notification. Furthermore, we do not decide whether trial counsel renders ineffective assistance if he fails to inform a client who is a foreign national of the right to consular access. However, we address this provision because we believe all criminal defense attorneys representing foreign nationals should be apprised of Article 36.

The Vienna Convention on Consular Relations is a multilateral treaty enacted for the purpose of "provid[ing] the right of consular notification and access when a national of a member state is arrested or otherwise detained in another member state." Howard S. Schiffman, Breard *and Beyond: The Status of Consular Notification and Access under the Vienna Convention,* 8 Cardozo J. Int'l & Comp. L. 27, 28 (2000) [hereinafter Schiffman]; *see* Linda Jane Springrose, Note, *Strangers in a Strange Land: The Rights of Non Citizens under Article 36 of the Vienna Convention on Consular Relations,* 14 Geo. Immigr. L.J. 185, 187 (1999) [hereinafter Springrose]. Article 36 of the Vienna Convention is the provision which specifically addresses communication with the foreign national. It provides, in pertinent part:

1. With a view to facilitating the exercise of consular functions relating to nationals of the sending State:

. . . .

(b) if he so requests, the competent authorities of the receiving State shall, without delay, inform the consular post of the sending State if, within its consular district, a national of that State is arrested or committed to prison or custody pending trial or is detained in any matter. Any communication addressed to the consular post by the person arrested, in prison, custody or detention shall also be forwarded by the said authorities without delay. *The said authorities shall inform the person concerned without delay of his rights under this sub-paragraph.*

Vienna Convention on Consular Relations, Apr. 24, 1963, art. 36, 21 U.S.T. 77, 101 (emphasis added).

Some courts have interpreted the language "of his rights" to impliedly create a private enforceable right of action in an individual. *See United States v. Carrillo,* 70 F.Supp.2d 854, 859 (N.D.Ill.1999); *United States v. Hongla–Yamche,* 55 F.Supp.2d 74, 77–78 (D.Mass.1999). At least one other court has cited two additional factors supporting the creation of a private enforceable right: (1) pre-adoption statements by conference participants expressing the desire to safeguard a foreign national's individual right to notification; and (2) other signatory nations recognizing individual notification rights, such as Mexi-

co, Argentina, Canada, and Paraguay. *See United States v. Rodrigues,* 68 F.Supp.2d 178, 182–83 (E.D.N.Y.1999). However, many courts have found the Vienna Convention's preamble to indicate the drafters' intent not to provide an individual right, as the preamble explicitly states the Vienna Convention does not intend to benefit individuals. *United States v. Lombera–Camorlinga,* 206 F.3d 882, 885 (9th Cir.2000); *United States v. Li,* 206 F.3d 56, 62 (1st Cir.2000); *Carrillo,* 70 F.Supp.2d at 859; *Hongla–Yamche,* 55 F.Supp.2d at 77.

Courts that have addressed the issue of consular notification are split on whether Article 36 actually creates an individual enforceable right. *Compare Breard v. Greene,* 523 U.S. 371, 376, 118 S.Ct. 1352, 1355, 140 L.Ed.2d 529, 538 (1998) (Vienna Convention "arguably confers" an individual right); *United States v. Briscoe,* 69 F.Supp.2d 738, 745 (D.V.I.1999) (Article 36 confers an individual right); *Hongla–Yamche,* 55 F.Supp.2d at 78 (same); *United States v. Alvarado–Torres,* 45 F.Supp.2d 986, 989 (S.D.Cal.1999) (same), *with United States v. Tapia–Mendoza,* 41 F.Supp.2d 1250, 1253 (D.Utah 1999) (doubting Article 36 confers an individual right); *Kasi v. Virginia,* 256 Va. 407, 508 S.E.2d 57, 64 (1999) (Article 36 does not create an individual right). The majority of courts assume, without deciding, such a right does exist, and then hold the requested remedy is inappropriate or the defendant did not prove he was prejudiced by the alleged Article 36 violation. *See United States v. Santos,* 235 F.3d 1105, 1107 (8th Cir.2000); *United States v. Chaparro–Alcantara,* 226 F.3d 616, 621 (7th Cir. 2000); *United States v. Cordoba–Mosquera,* 212 F.3d 1194, 1196 (11th Cir.2000); *Lombera–Camorlinga,* 206 F.3d at 885; *Li,* 206 F.3d at 60; *United States v. Martinez–Villalva,* 80 F.Supp.2d 1152, 1156 (D.Colo.1999); *Carrillo,* 70 F.Supp.2d at 859; *Rodrigues,* 68 F.Supp.2d at 185.

Courts have consistently held the exclusion of evidence or dismissal of charges are not remedies afforded by the Vienna Convention. *See Chaparro–Alcantara,* 226 F.3d at 621–22; *Lombera–Camorlinga,* 206 F.3d at 885; *Carrillo,* 70 F.Supp.2d at 861; *Rodrigues,* 68 F.Supp.2d at 185.

Those courts that have found the existence of an individual right have often relied upon Supreme Court dicta in *Breard v. Greene.* In *Breard,* the Court noted that Article 36 "arguably confers on an individual the right to consular assistance following arrest." *Breard,* 523 U.S. at 376, 118 S.Ct. at 1355, 140 L.Ed.2d at 538. However, the Court dismissed the habeas corpus petition, finding the petitioner could not prove the Article 36 violation resulted in prejudice. *Id.* at 377, 118 S.Ct. at 1355, 140 L.Ed.2d at 538. Jurisdictions addressing alleged Article 36 violations have similarly required the individual to demonstrate he was prejudiced by the violation. *See Cordoba–Mosquera,* 212 F.3d at 1196; *State v. Cevallos–Bermeo,* 333 N.J.Super. 181, 754 A.2d 1224, 1227–28 (2000).

At the postconviction trial, Salvador A. Cicero, an officer of the Mexican Consulate, detailed how a foreign national defendant would benefit from exercising his consular rights. Cicero testified that a Mexican consular officer would explain the significant differences between the American and Mexican criminal justice systems, as well as the severity of the charges. An officer would be available to address the general obstacles presented by cultural barriers, and to monitor the case and assist with interpretation. An officer would help the foreign national to obtain a greater understanding of the charges and maximum sentence, which knowledge would aid the foreign national when considering plea offers and the presentation of his defense.

152 ■

■ When representing a foreign national criminal defendant, counsel has a duty to investigate the applicable national and foreign laws. *See Strickland,* 466 U.S. at 690, 104 S.Ct. at 2066, 80 L.Ed.2d at 695(counsel has duty to investigate all relevant laws and facts). Trial "[c]ounsel for foreign nationals should always inquire whether the client has been made aware of his right to contact consul, and, if not, [counsel] should advise hi[s] [client] of this right." Springrose, at 188–89. We believe all criminal defense attorneys representing foreign nationals should be aware of the right to consular access as provided by Article 36, and should advise their clients of this right. Criminal defense attorneys are not equipped to provide the same services as the local consulate. *Id.* at 195. Consular officials can eliminate false understandings and prevent actions which may result in prejudice to the defendant. *Id.* Thus, consular access may very well make a difference to a foreign national, in a way that trial counsel is unable to provide. *Id.*

### 6. Ineffective Assistance of Appellate Counsel.

Lastly, before we can grant Jose's application for postconviction relief, we must find he preserved error on his ineffective assistance of trial counsel claim. Jose did not raise the issue of trial counsel's ineffective assistance in his direct appeal of his conviction. However, we have held the ineffective assistance of appellate counsel constitutes a sufficient reason for an applicant not raising an issue on direct appeal. *Berryhill,* 603 N.W.2d at 245; *Osborn,* 573 N.W.2d at 921; *Washington,* 304 N.W.2d at 234; *see* Iowa Code § 822.8 (1995). For Jose to have preserved error on his ineffective assistance of trial counsel claim, we must find his appellate counsel ineffective for failing to raise this issue on direct appeal.

■ We find Jose's appellate counsel performed deficiently when she advised Jose that he could raise the ineffective assistance of trial counsel issue in postconviction relief proceedings. This statement was a misstatement of the law under Iowa Code section 822.8. Any reasonably competent attorney engaged in criminal appellate practice would find appellate counsel's advice to be clearly erroneous. Because we held Jose's ineffective assistance of trial counsel claim to be successful, appellate counsel prejudiced Jose by not bringing the claim on direct appeal. Thus, Jose adequately preserved error.

### V. Conclusion.

We conclude Jose has sufficiently established a claim for ineffective assistance of counsel. We grant the application for postconviction relief, reverse the order of the district court, and grant a new trial.

**REVERSED AND REMANDED.**

All justices concur except CARTER, J., who dissents.

CARTER, Justice (dissenting).

I dissent.

In applying the standard which the court agrees must be met in order to satisfy the prejudice element of an ineffective–assistance–of–counsel claim, I am convinced that prejudice has not been established. I would affirm the judgment of the district court.