# IN THE COURT OF APPEALS OF IOWA

No. 20-0384
Filed January 27, 2022

**JOSEPH WILLIAM RENDON,**
        Applicant-Appellant,

**vs.**

**STATE OF IOWA,**
        Respondent-Appellee.
_____

        Appeal from the Iowa District Court for Polk County, David Nelmark, Judge.


        Joseph Rendon appeals the denial of his application for postconviction relief. **AFFIRMED.**


        Alexander Smith of Parrish Kruidenier Dunn Gentry Brown Bergmann & Messamer L.L.P., Des Moines, for appellant.

        Thomas J. Miller, Attorney General, and Thomas E. Bakke, Assistant Attorney General, for appellee State.


        Considered by May, P.J., and Vogel and Mullins, S.J.J.*

        *Senior judges assigned by order pursuant to Iowa Code section 602.9206 (2022).

**VOGEL, Senior Judge.**

Joseph Rendon appeals the denial of his application for postconviction relief (PCR). He was previously convicted of first-degree burglary and nine counts of first-degree robbery. He argues he received ineffective assistance from his trial counsel due to counsel's failure to investigate and present an alibi defense, counsel's failure to impeach witnesses, and cumulative prejudice. We reject his arguments and affirm.

## I. Background Facts and Proceedings

We set forth the factual basis for Rendon's convictions on direct appeal:

> On September 24, 2014, Thomas Dean hosted an illegal high-stakes poker game in an outbuilding at his home on 86th Street in Johnston. Rendon had previously attended a poker tournament at Dean's home and knew there would be a large amount of cash at the game. At about 1:30 a.m. on September 25, four men—Garvis Thompson, Arthur Benson, Jacari Benson (Jacari), and David Moore—came into the outbuilding. Three of the men carried guns, and the fourth had a bag. The intruders took money and cell phones from the people participating in the poker game. The intruders made the poker players lay on the floor, and then ran out to their get-a-way vehicle, a Chevrolet Impala, driven by Benson's girlfriend, McKenzie McCracken.
>
> One of the poker players, Justin Lisk, ran out, got into his pickup truck, and followed the Impala south on 86th Street. Lisk's cell phone had not been taken by the intruders and he called 911 to inform officers of the intruders' location. McCracken lost control of the Impala and it struck another vehicle. The occupants of the Impala abandoned it and fled on foot. Officers set up a perimeter in an attempt to capture the criminals. The only vehicle to come through the perimeter was a maroon SUV.
>
> Officers found paperwork addressed to Moore in the Impala. Also, fingerprints from Thompson and Jacari were found on the door handles of the Impala and Thompson's DNA was found on a black ski mask. Officers picked up Thompson, Benson, Jacari, and Moore, and analyzed their cell phones. They found a pattern of calls between the men and with Rendon. The subscriber for Thompson's cell phone was Rendon. Video taken by a security camera on the corner of 86th Street and Meredith Avenue from the night in question showed the Impala, followed by Lisk's pickup, followed by a maroon

SUV. On September 26, a maroon SUV, driven by Rendon, was stopped by State troopers and given a warning for speeding on eastbound Interstate 80.

Rendon was charged with burglary in the first degree and nine counts of robbery in the first degree. Prior to trial, the district court ruled "evidence [of drug dealing] could be admitted at least to some extent," in order to show the relationship between the parties. After jury selection, Rendon filed a motion in limine seeking to prohibit evidence of the specific types of drugs he sold. The court ruled the witnesses could only refer to generic "drugs," not specific types of drugs.

Moore accepted a proffer agreement from the State and testified at Rendon's trial. Moore testified he was Thompson's cousin and often went to Thompson's apartment. Moore stated Rendon told him and Thompson about the poker games and how it would be easy to take the money. He stated Rendon had the idea for the robbery and Thompson planned the details. Moore testified Rendon brought over gloves for the group and zip ties to use on the poker players. Moore stated Rendon dropped him off at Dean's home, and Rendon was to drive around to make sure no one else was in the vicinity.

Thompson also entered into a proffer agreement with the State. Thompson testified Rendon supplied him with drugs and Thompson distributed the drugs to Benson and Jacari, who helped sell the drugs. Thompson stated Rendon came to him with the idea of robbing a poker game, and they discussed the idea with Moore, Benson, and Jacari. Thompson testified Rendon was supposed to drive behind the Impala to make sure no one was following them after the robbery. Thompson stated they obtained $17,000 in the robbery and Rendon received $8000 of that amount. The day after the robbery, Rendon drove Thompson to the Quad Cities in a maroon SUV. Thompson testified he and Rendon planned to use the money obtained in the robbery to purchase more drugs, which they would then sell.

After Thompson's testimony, Rendon sought a mistrial, claiming there was more evidence about drug dealing than was anticipated and it led to undue prejudice. The court ruled, "I don't think at this point in time there's sufficient undue prejudice to grant a mistrial." The court again pointed out the evidence of drug dealing was admissible to show the relationship between the parties.

Jacari testified Thompson was his cousin. He testified he heard Rendon talking about the poker game that night. Jacari testified Rendon was driving a maroon SUV.

Detective Tyler Tompkins of the Johnston Police Department testified he had taken several classes on analyzing cell phones and cell phone records. Detective Tompkins testified the cell phone records showed Rendon, Thompson, Moore, and Jacari were often in contact with each other before the robbery and after the robbery.

According to the records, the cell phone towers used for the calls were consistent with the testimony of Thompson, Moore, and Jacari about their activities on September 24 and 25, as well as Rendon and Thompson's drive to the Quad Cities on September 26.

The district court denied Rendon's motion for judgment of acquittal. The jury found Rendon guilty of first-degree burglary and nine counts of first-degree robbery. Rendon was sentenced to a total of seventy-five years in prison.

*State v. Rendon*, No. 15-1832, 2016 WL 6270092, at *1–2 (Iowa Ct. App. Oct. 26, 2016) (alteration in original) (footnotes omitted). We affirmed Rendon's convictions on direct appeal. *Id.* at *7.

In February 2017, Rendon filed his PCR application. Rendon later amended his application to assert numerous claims, including claims his trial counsel, Amy Kepes, provided ineffective assistance. On the State's motion, the district court consolidated Rendon's PCR action with another PCR action by Benson, who was his co-defendant in the underlying trial. The matter proceeded to a joint PCR trial in October 2019. Kepes's deposition testimony was admitted as an exhibit, and other witnesses testified at the trial. The district court fully denied Rendon's PCR application. Rendon appeals the denial of his ineffective-assistance claims.

**II. Standard of Review**

We generally review PCR proceedings for correction of errors at law. *Ledezma v. State*, 626 N.W.2d 134, 141 (Iowa 2001). However, we review ineffective-assistance-of-counsel claims de novo. *Id.* "In addition, we give weight to the lower court's findings concerning witness credibility." *Id.*

## III. Ineffective Assistance of Counsel

"To prevail on a claim of ineffective assistance of counsel, the applicant must demonstrate both ineffective assistance and prejudice." *Id.* at 142. "Both elements must be proven by a preponderance of the evidence." *Id.* To establish ineffective assistance, "the applicant must demonstrate the attorney performed below the standard demanded of a reasonably competent attorney." *Id.* To establish prejudice, "the applicant must demonstrate 'that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Id.* at 143 (quoting *Strickland v. Washington*, 466 U.S. 668, 694 (1984)).

### A. *Investigation and Presentation of Alibi Defense*

First, Rendon argues attorney Kepes was ineffective for failing to fully investigate and present an alibi defense. Specifically, Rendon argues Kepes should have called his aunt, Carla Treanor, as a witness to testify about his whereabouts during the robbery. During the PCR hearing, Treanor testified she lived with Rendon at the time of the robbery. She further testified Rendon came to their home early in the evening of September 24, 2014, he was still home when she left for work the next morning, and she would have noticed if he left the home during the night.

Treanor testified she never spoke to Kepes until Rendon's trial, and Kepes testified she did not recall speaking to Treanor about the night of the robbery prior to the trial. However, Kepes testified that had Rendon told her that Treanor could account for his presence during the robbery, she "would have followed up on that" because it "could have given him an alibi." Kepes added that Treanor's testimony

could only "have given him an alibi as to whether he was the guy in the truck driving by in Johnston. It doesn't give him an alibi as to whether he was involved in this thing." Even if Treanor had been called to testify, her account of the evening—that Rendon came home drunk and alone, showered, and went to bed—differs from Rendon's PCR testimony that he drove home with his paramour. He also testified that he drove his paramour back to her home later in the evening, which again conflicts with Treanor's account that Rendon did not leave the home again that evening.

Additionally, Rendon was adamant that he never intended to have his paramour testify at trial. Rendon acknowledged he decided he would not testify in his own defense at trial at least in part because that would allow the State to call his paramour as a rebuttal witness. By not testifying in his own defense, Rendon prevented the State from questioning his paramour about her drug use, which could endanger her custody of her child. In a recorded jailhouse call, Rendon admitted he refused to call other potential alibi witnesses in order to similarly protect his paramour. The district court concluded Rendon decided against pursuing any alibi defense to protect his paramour. Considering the State could have called the paramour as a witness to address the discrepancies in any alibi testimony, we agree with the court, and Kepes could not have been ineffective for failing to investigate Treanor about an alibi defense Rendon did not want to present.

Furthermore, the district court noted several other instances when Treanor's testimony was internally inconsistent or otherwise difficult to accept at face value. The court also noted other evidence in the record established Rendon

was not home on the night of the robbery, including testimony about Rendon's role in the robbery and cell phone records that showed Rendon's cell phone was moving around town and placing calls near the time of the robbery. Therefore, Rendon has not shown the outcome of his trial would have been different if Treanor had testified, and we reject Rendon's claim that Kepes was ineffective for failing to present Treanor as an alibi witness.

B. *Impeachment of State's Witnesses*

Second, Rendon argues Kepes was ineffective for failing to properly impeach the State's witnesses. Specifically, Rendon argues Kepes missed several opportunities to undermine the credibility of Thompson, Moore, and Jacari, the witnesses who admitted to participating in the robbery and testified against Rendon.

All three witnesses were extensively cross-examined at trial, by both Kepes and co-defendant Benson's attorney. The jury was aware all three witnesses admitted to participating in the armed robbery and were testifying against Rendon as part of their favorable plea agreements. The fact Kepes did not raise the witnesses' prior convictions was unlikely to change the outcome considering they already admitted at trial to participating in the robbery and burglary—serious crimes on their own. Rendon also faults Kepes for not questioning Thompson about feeling "double-crossed" by Rendon as a motivation for Thompson's testimony; however, as the district court noted, Thompson was apparently upset Rendon did not use his proceeds from the robbery to purchase drugs for Thompson to sell, so this line of questioning would be unlikely to help Rendon at trial.

Rendon raises several other lesser inconsistencies Kepes did not use for impeachment at trial. However, Kepes and Benson's counsel already impeached the witnesses at trial. Kepes testified to concern about "beating a dead horse" by spending more time on impeachment, which could lead to jurors "growing tired and frustrated" and the defense "look[ing] weak." "Miscalculated trial strategies and mere mistakes in judgment normally do not rise to the level of ineffective assistance of counsel." *Ledezma*, 626 N.W.2d at 143. Furthermore, other evidence corroborates Rendon's role in the robbery, including cell phone records showing communications between Rendon and the witnesses, a vehicle matching Rendon's vehicle being near the robbery, and testimony that Rendon owed a "considerable amount" in rent at the time of the robbery. We do not find Kepes provided ineffective assistance or prejudice resulted from not attempting further impeachment of the State's witnesses, and we reject Rendon's ineffective-assistance claim.

C. *Cumulative Prejudice*

Finally, Rendon argues the cumulative effect of Kepes's errors in failing to present Treanor as an alibi witness and failing to further impeach the State's witnesses shows he suffered prejudice. *See State v. Clay*, 824 N.W.2d 488, 500 (Iowa 2012) (stating Iowa looks at "the cumulative effect of counsel's errors to determine whether the defendant satisfied the prejudice prong"). As stated above, we do not find Kepes provided ineffective assistance in any of Rendon's ineffective-assistance claims. *See id.* at 501 (stating we look at cumulative prejudice only if the applicant establishes counsel was ineffective in more than one claim). Even if we assume Kepes was ineffective, the cumulative effect of those

errors—for reasons explained above—does not undermine our confidence in the outcome when considering the record as a whole.

## IV. Conclusion

We reject Rendon's claims that his trial counsel was ineffective for failing to present an alibi witness or for failing to further impeach the State's witnesses. We also find no cumulative prejudice resulted from these claims of ineffective assistance.

**AFFIRMED.**