# IN THE COURT OF APPEALS OF IOWA

No. 15-0862
Filed July 27, 2016

**ROBERTO MORALES DIAZ,**
     Applicant-Appellee,

**vs.**

**STATE OF IOWA,**
     Respondent-Appellant.
_____

Appeal from the Iowa District Court for Tama County, Mary E. Chicchelly,

Judge.

The State appeals the postconviction court's grant of relief.  **REVERSED.**

Thomas J. Miller, Attorney General, and Kevin Cmelik and Sharon K. Hall,

Assistant Attorneys General, for appellant State.

Daniel J. Vondra of Cole & Vondra, P.C., Iowa City, for appellee.

Heard by Vogel, P.J., and Doyle and Bower, JJ.

**BOWER, Judge.**

The State appeals the postconviction court's grant of relief in setting aside Robert Morales Diaz's (Morales) 2014 conviction for forgery. The State claims the court erred in finding Morales's plea counsel breached a duty by inadequately informing Morales of the immigration consequences of his guilty plea. We reverse.

## I.    BACKGROUND FACTS AND PROCEEDINGS

In January 2013, Toledo Police Officer McMillen and Tama County Officer Bina were dispatched to a residence concerning a verbal domestic incident. When the officers arrived they spoke with Morales and his then-girlfriend. Due to communication issues, McMillen requested a translator. Morales would not allow the officers to enter the residence, and, owing to the cold, McMillen asked Morales to sit in his police car. McMillen advised Morales he was not under arrest and requested identification. Morales presented McMillen with a Texas identification bearing his name and picture, but it "did not have any security features." When McMillen checked the information on the card with dispatch, the information came back as a different individual. After McMillen questioned Morales, Morales admitted to purchasing the identification at an office building for $100, but denied the identification was forged. Morales said he had been in the United States for nine years and had used the identification for six years. McMillian arrested Morales for forgery and contacted the Department of Homeland Security (DHS), which placed an immigration detainer on Morales as an alien subject to removal. The detainer stated DHS would take custody of Morales upon his release.

Shortly after his arrest in January, Morales was processed by DHS in Cedar Rapids as "an alien present in the United States who has not been admitted or paroled" since February 2002. At that time, Morales was provided with "contact information for a free or low-cost legal service provider." Morales declined an offer to speak with the Mexican Consulate.

On March 8, 2013, Morales was charged with forgery, in violation of Iowa Code sections 715A.2(1), 715A.2(1)(d), and 715A.2(2)(a) (2011), due to his fraudulent possession of a forged writing—the Texas identification. On June 27, Morales waived his speedy trial rights to allow him time to contact an immigration attorney. The trial date was reset multiple times to allow Morales to resolve his immigration issues. On April 25, 2014, the court continued trial for the final time noting Morales had an immigration hearing scheduled that would be dispositive of his immigration issues. In early July, a guilty plea hearing was scheduled for July 24. Morales did not attend the hearing, and the court issued a warrant for his arrest. On July 29, DHS issued a warrant of removal/deportation based on Morales's failure to attend an immigration hearing that had been scheduled for July 8 in Omaha, Nebraska.

State authorities arrested Morales on August 20. On August 22, Morales filed a waiver of rights and entered a guilty plea to the lesser-included-offense of forgery, an aggravated misdemeanor in violation of Iowa Code section 715A.2(2)(b). He waived his right to be present and requested immediate sentencing. The plea included the following language: "I understand that a criminal conviction deferred judgment or deferred sentence, may result in my deportation or have other adverse immigration consequences if I am not a United

States citizen." In exchange for the plea, the State agreed to recommend a suspended two-year term of incarceration, a minimum fine, and two years of unsupervised probation. The court found "that the plea is voluntarily entered with an understanding of the charge, knowledge of the criminal consequences and the constitutional rights waived by said plea; that the Minutes of Testimony provide a factual basis supporting the charge, and [Morales's] written plea is hereby accepted and entered of record." The court sentenced Morales based on the recommendations in the plea agreement. Morales did not directly appeal from this sentence.

On November 25, 2014, Morales filed an application for postconviction relief (PCR) claiming his trial counsel breached a duty, pursuant to *Padilla v. Kentucky*, 559 U.S. 356, 373 (2010), by failing to advise him of the clear or automatic immigration consequences of his guilty plea. The PCR court granted Morales's request for an expedited hearing given DHS's filing of a final administrative removal order on March 18, 2015.

An evidentiary hearing was held on April 10, 2015. Morales, his trial counsel Chad Frese, and Morales's girlfriend testified. On April 17, the court issued a ruling finding Frese had breached a duty and Morales had established prejudice. The court vacated Morales's guilty plea and set the matter for trial. The State now appeals.

## II.     SCOPE AND STANDARD OF REVIEW

We review a claim of ineffective assistance of counsel de novo. *See Ennenga v. State*, 812 N.W.2d 696, 701 (Iowa 2012). An ineffective-assistance-of-counsel claim requires a demonstration of both ineffective assistance and

prejudice. *Ledezma v. State*, 626 N.W.2d 134, 142 (Iowa 2001) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). The ineffective-assistance prong requires proof the attorney performed below the standard demonstrated by a reasonably competent attorney as compared against prevailing professional norms. *Id.* There is a strong presumption the attorney performed his duties competently. *Id.* Once the applicant has shown ineffective assistance, he must also show the error caused prejudice. *Id.* at 143. The prejudice prong requires proof that, but for the ineffective assistance, "the result of the proceeding would have been different." *Id.* (citing *Strickland*, 466 U.S. at 694). The applicant must "show that counsel's deficient conduct more likely than not altered the outcome in the case." *Id.* (citing *Strickland*, 466 U.S. at 693). Morales must prove the "essential duty" and "prejudice" elements by a preponderance of evidence. *See Ennenga*, 812 N.W.2d at 701.

### III. MERITS

The State claims the district court improperly found Morales's trial attorney breached a duty in advising Morales on the immigration consequences and in finding Morales was prejudiced by his attorney's advice given the circumstances.[1]

---

[1] Morales claims the State has not preserved error on any claim concerning what he knew about his immigration status at the time of his plea and the certainty of conviction. *See, e.g.*, *DeVoss v. State*, 648 N.W.2d 56, 60 (Iowa 2002) (finding the State's failure to challenge error preservation in a PCR action at the district court level barred it from doing so on appeal). The district court's order shows it considered and ruled upon both the breach and prejudice prongs of an ineffective assistance of counsel claim. The ruling adequately addresses the State's claims on appeal, and the claims are necessarily included in an ineffective assistance argument. Therefore we find error is preserved for our review. *See Lamasters v. State*, 821 N.W.2d 856, 862 (Iowa 2012) (noting error is preserved when an issue is raised and ruled upon by the district court).

The State claims Morales's trial counsel did not affirmatively misadvise Morales in telling him he was going to be deported no matter what happened with the criminal charge.

At the PCR hearing, Morales testified Frese "never told me anything [concerning the immigration consequences of the conviction]. He just gave me some papers that I had to sign. And I was in the jail, and he just informed me about the charges and what was going to happen." On cross-examination, Morales admitted he missed the July DHS immigration hearing due to a lack of transportation to Omaha. He failed to appear for the July hearing in Tama County due to a fear of deportation. He turned himself in to Tama County authorities after learning from Frese he would forfeit his $10,000 bail bond for failing to appear. He further noted, "Frese told me that he was going to get me out clean because I was on probation. . . . I was desperate since my daughter was little—and I told him okay, fine, just get me out as soon as you can."

Frese testified his primary goals were to keep Morales out of jail and to keep Morales from being deported. He noted the criminal charge made these goals "much more difficult, if not impossible for him to stay in the country." To achieve these goals, Frese sought to delay the criminal case until after the July immigration hearing. He also sought to have Morales's charge reduced so it would not "have a punishment that would rise to the level" requiring deportation. During this two month period (from June through July 2014), Frese noted Morales stopped communicating with him, but Frese was able to communicate with Morales's girlfriend. Morales resumed communication with Frese two days

before the bond forfeiture hearing. Concerning his conversation with Morales about the immigration consequences of the plea, Frese stated:

> I went down to the jail with [an interpreter] and spoke to Roberto and explained to him that he had failed to appear and that now that he turned himself in that the case would be reset.
> . . . .
> Roberto was very apologetic, he was sorry that he let me down, he was sorry that all this happened, that he wanted to just get this over with. I explained to Roberto that I would talk to you about getting this over with today, that day. But I told him very clearly that chances were since he missed his immigration hearing on top of everything, *that he was probably going to be deported no matter what happened.* And he said he didn't care, that he was sorry that he let everybody down, he was almost in tears, and he just wanted to make things right, and if he had to go to Mexico, he'd go to Mexico. So I came back up and got the written plea, talked to you, prepared it, went back down to jail with [the interpreter] and completed it and explained it to him, and he signed it.

(Emphasis added.)

Frese also stated, instead of obtaining a deferred judgment on the felony charge, he thought a plea agreement for a misdemeanor with less than one year in jail would give Morales a better chance of staying in the country. On cross-examination, Frese indicated, pursuant to *Padilla*, he knew of his duty to "fully investigate possible immigration consequences of a criminal conviction," but that the law did not require a statement of the specific consequences in the guilty plea. Frese admitted he did not know, regardless of the fact Morales missed the immigration hearing, he might have been able to have his case reopened. Frese also admitted he did not know of, or advise, Morales on the exact immigration consequences stemming from the conviction. Frese reiterated he had advised Morales to seek immigration counsel. Frese had consulted with an immigration counsel involving Morales's case and the immigration counsel told Frese if he

pled to "a misdemeanor level offense with less than one year of punishment, that he would have a shot to stay in the country."

An attorney's duty is not merely to refrain from giving affirmative misadvice, but defense counsel must inform a client whether a plea carries a risk of deportation. *Padilla*, 559 U.S. at 373. "When the law is not succinct and straightforward . . . a criminal defense attorney need do no more than advise a noncitizen client that pending criminal charges may carry a risk of adverse immigration consequences." *Id.* at 369. When deportation consequences are clear, the duty to give correct advice is equally clear. *Id.* In order to prevail on a claim of ineffective assistance, a defendant must show not only that counsel failed to advise him or her of the risk of adverse immigration consequences, but also the defendant must meet the prejudice requirement by showing "a decision to reject the plea bargain would have been rational under the circumstances." *Id.* at 372.

In *Lopez-Penaloza v. State*, 804 N.W.2d 537 (Iowa Ct. App. 2011), our court decided a matter similar to the matter at hand. *Lopez-Penaloza* concerned a PCR ineffective assistance claim raising a *Padilla* challenge to the appellant's (Lopez-Penaloza) conviction for attempting to obtain an identification card in someone else's name. *Lopez-Penaloza*, 804 N.W.2d at 539. Trial counsel told Lopez-Penaloza a guilty plea was the "'safest' way to resolve the case, and he was unsure whether the guilty plea would lead to adverse immigration consequences." *Id.* The written guilty plea form contained language advising Lopez-Penaloza "'that a criminal conviction, deferred judgment, or deferred sentence may affect [her] status under federal immigration laws.'" *Id.* at 539–40.

The court's sentencing order contained similar "immigration consequences" language. *Id.* at 540. In finding Lopez-Penaloza's trial counsel had not breached a duty or caused prejudice pursuant to *Padilla*, our court reasoned:

> From the record, it appears Lopez–Penaloza signed the written guilty plea form and the sentencing order at the same time. She was warned twice about the risk of deportation. The written guilty plea form advised her "that a criminal conviction, deferred judgment, or deferred sentence may affect [her] status under federal immigration laws." And the sentencing order similarly stated, "The Defendant was advised that a criminal conviction, deferred judgment, or deferred sentence may affect the Defendant's status under federal immigration laws." Lopez–Penaloza argues these warnings were insufficient under *Padilla* because the deportation consequences of her plea were "truly clear"; thus, counsel needed to tell her that a conviction for tampering with records would result in automatic deportation. . . . .
>
> As the Supreme Court recognized in *Padilla*, "Immigration law can be complex, and it is a legal specialty of its own." [*Padilla*, 559 U.S. at] 369. "There will, therefore, undoubtedly be numerous situations in which the deportation consequences of a particular plea are unclear or uncertain." *Id.* That was not the case in *Padilla* where the applicant was convicted of a crime involving a controlled substance, which is a presumptively mandatory deportable offense. *See id.* at 368 (stating 8 U.S.C. § 1227(a)(2)(B)(i) "specifically commands removal for all controlled substances convictions except for the most trivial of marijuana possession offenses"). Here, however, Lopez–Penaloza was convicted of tampering with records. This crime falls under the broad category of deportable offenses known as "crimes involving moral turpitude" (CIMT).
> . . . .
> Because the statutory provision governing the deportation consequences of Lopez–Penaloza's guilty plea was not "succinct, clear, and explicit," we conclude defense counsel owed her the more limited duty of advising her "that pending criminal charges may carry a risk of adverse immigration consequences." *Padilla*, 559 U.S. at 369.

*Id.* at 544–47

Morales claims his attorney affirmatively misadvised him of the immigration consequences of his plea and, therefore, breached his duty to Morales. We disagree. Our first step is to determine if the immigration

consequences were "unclear or uncertain." *Padilla*, 559 U.S. at 369. If the immigration consequences are unclear, then trial counsel only has a duty to advise a plea "may carry the risk of adverse immigration consequences." *Id.* For the same reasons we listed in *Lopez-Penaloza*, we find the immigration consequences were sufficiently unclear that Frese was not required to list the specific immigration consequences of the conviction. *See Lopez-Penaloza*, 804 N.W.2d at 545–46 ("[I]n order to accurately advise Lopez–Penaloza about the deportation consequences of her plea, her counsel would have been required, like we were, to step into the 'labyrinth' of immigration law. . . . This would have involved consideration not only of the statute itself, but also of 'the federal statutory scheme that governs immigration law, regulatory provisions enacted to implement the [Immigration and Nationality Act (INA)], and decisions of the [Board of Immigration Appeals] and federal courts regarding the proper analysis of the INA's many requirements and prohibitions.'" (citation omitted)). Finally, we note the district court's reliance on an immigration law expert's opinion only provides further support for our conclusion the immigration consequences were sufficiently unclear.

We find Frese did not breach his duty to Morales and reverse the district court's ruling.

Even if Frese did breach his duty to Morales, Morales has not shown that but for his counsel's error, "the result of the proceeding would have been different." *See Strickland*, 466 U.S. at 694. He has not shown a decision to decline the plea agreement would have been "rational under the circumstances." *See Padilla*, 559 U.S. at 372. The record shows Morales admitted he had been

using the false identification for six years. The identification was not obtained from a government agency, but from an office building for $100. Morales was initially charged with a class "D" felony, but he was offered a plea agreement for an aggravated misdemeanor and unsupervised probation. Morales has not shown, and the record does not suggest, he could have received a better outcome if he had decided to go to trial. Remaining incarcerated and waiting for a trial with a likely unfavorable outcome for Morales would have been irrational. We find Morales has not proven he was prejudiced by his counsel's advice and we reverse.

**REVERSED.**