# IN THE COURT OF APPEALS OF IOWA

No. 19-0950
Filed January 21, 2021

**MARCIA SHAFFER,**
    Applicant-Appellant,

**vs.**

**STATE OF IOWA,**
    Respondent-Appellee.

_____

Appeal from the Iowa District Court for Dallas County, Michael K. Jacobsen, Judge.

The applicant appeals the denial of her application for postconviction relief. **AFFIRMED.**

Andrew Dunn of Parrish Kruidenier Dunn Boles Gribble Gentry Brown & Bergmann L.L.P., Des Moines, for appellant.

Thomas J. Miller, Attorney General, and Kyle Hanson, Assistant Attorney General, for appellee State.

Considered by Doyle, P.J., Schumacher, J., and Potterfield, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2021).

**POTTERFIELD, Senior Judge.**

Marcia Shaffer appeals from the denial of her application for postconviction relief (PCR). As she did before the district court, she makes claims of actual innocence and argues her trial counsel provided ineffective assistance.

**I. Background Facts and Proceedings.**

In 2013, Shaffer was charged with eight crimes, including arson in the first degree, burglary in the first degree, attempted murder, three charges of possession of a controlled substance, and two charges of unlawful possession of prescription drugs.

With the assistance of counsel, Shaffer reached a plea agreement with the State. Pursuant to that agreement, Shaffer entered *Alford* guilty pleas[1] to the reduced charges of arson in the second degree and burglary in the second degree. She also entered *Alford* guilty pleas to two counts of possession of a controlled substance, third offense (oxycodone and hydrocodone). The other four charges were dismissed. Additionally, Shaffer and the State agreed to recommend the four sentences "would run consecutive with each other and not concurrently."

At sentencing, Shaffer took advantage of the fact that none of the crimes to which she entered *Alford* guilty pleas were forcible felonies and advocated for suspended prison sentences and probation. The State urged the court to sentence Shaffer to consecutive terms of imprisonment for a total of thirty years of

---

[1] *North Carolina v. Alford*, 400 U.S. 25 (1970) (allowing a defendant to plead guilty to a crime without admitting to committing the actions underlying the charge where "a defendant intelligently concludes that [their] interests require entry of a guilty plea and the record before the judges contains strong evidence of actual guilt").

incarceration. The court sentenced Shaffer to four consecutive prison terms, for a total term of incarceration not to exceed thirty years.

Shaffer did not file an appeal.

In late 2014, she filed a PCR application, which she later amended with the assistance of counsel. Shaffer asserted she was actually innocent and claimed trial counsel provided ineffective assistance in several ways.

Following a hearing in March 2019, the district court denied Shaffer's PCR application. She appeals.

## II. Standards of Review.

"Generally, an appeal from a denial of an application for postconviction relief is reviewed for correction of errors at law." *Goode v. State*, 920 N.W.2d 520, 523 (Iowa 2018) (citation omitted). But when "the applicant asserts claims of a constitutional nature"—such as claims of ineffective assistance of counsel—our review is de novo. *Ledezma v. State*, 626 N.W.2d 134, 141 (Iowa 2001).

## III. Discussion.

### A. Actual Innocence.

Shaffer's convictions stem from two different incidents. The burglary and arson convictions involve an incident that took place at the home of Thomas Carroll in the early morning hours of June 3, 2013. The two convictions for possession of a controlled substance stem from pills found in Shaffer's possession on July 15, 2013, when she was arrested for the incident at Carroll's home. Here, Shaffer purports to claim actual innocence to all four crimes to which she pled guilty.

In order to succeed on her claims, Shaffer "must meet the demanding actual-innocence standard to prove the validity of [her] actual-innocence claims."

*Dewberry v. State*, 941 N.W.2d 1, 5 (Iowa 2019) (quoting *Schmidt v. State*, 909 N.W.2d 778, 790 (Iowa 2018)). To do so, she "must show 'by clear and convincing evidence that, despite the evidence of guilt supporting the conviction, no reasonable fact finder could convict the applicant.'" *Id.* at 5 (citation omitted).

*1. Arson and Burglary.* Shaffer argues she has proved her innocence because "[f]rom her guilty plea going forward, [she] has proclaimed her innocence" and notes she had an alibi through Natalie Fowler. But Shaffer does nothing to address the multitude of strong evidence against her and overstates the facts to which Fowler attested.

On the night of Sunday, June 2, 2013, Shaffer went to a local bar with her coworker, Amanda, and her coworker's husband. Surveillance video later obtained from the bar confirms this and shows the outfit Shaffer was wearing. Sometime in the early hours of June 3, the three left the bar together. According to Amanda's deposition, she dropped Shaffer off at her car and then Amanda and her husband went home. After they arrived, Amanda called Shaffer to check on her. Shaffer answered and reported she was "at Tim or Tom's house" and was fine.[2] Based on footage obtained from a trail camera Carroll had previously installed pointing at the door to his home, a woman entered his home and removed items from approximately 2:30 a.m. until 3:30 a.m.[3] According to Carroll's

---

[2] That this call took place was later corroborated when an officer checked Shaffer's call log on her phone.

[3] We note Carroll testified in his deposition that he recognized Shaffer as the person in the trail camera photographs. Additionally, Detective Adam Infante filed a police report, which was attached to the minutes of evidence, that stated:

> The [bar surveillance] video shows Shaffer wearing a hooded sweatshirt with letters and a logo on it. Hair is also down. I took a still photo from this video and compared it to the photos taken from

deposition, he awoke to his smoke alarm beeping around 4:00 a.m. He went to grab his cell phone to call for help and realized it was gone, so he left the house and drove to a neighbor's home approximately one mile away. Sometime after police arrived, Carroll noticed a smoked cigarette and flashlight sitting on his deck and knew neither belonged to him. Police took both into evidence, and the cigarette was later tested and found to have on it Shaffer's DNA. After firefighters put out the smoldering fire in Carroll's laundry room, they began investigating and found three separate fires had been lit in different areas of Carroll's home. Carroll noticed some items were missing, including a boom box that had previously been owned by Shaffer.

Later that same morning, sometime before 8:00 a.m., Shaffer called Amanda and told her to say they had been together until 4:30 a.m. if anyone asked. Amanda indicated she would not do this and later told police about Shaffer's request.

A few days later, police obtained a search warrant for Shaffer's home. While there, they found items Carroll identified as his, including Carroll's cell phone. Shaffer initially denied knowing how she had Carroll's phone or other items. During the same conversation, Shaffer eventually admitted to being at Carroll's home on June 3. She claimed she stayed in the vehicle while "Becky" went inside the home and took several items. Shaffer told the officer she received

---

Tom Caroll's trail camera. The photos show that Shaffer is also wearing the same sweatshirt at Carroll's house an hour later after leaving [the bar].

We are unable to independently conclude it is Shaffer, wearing the same sweatshirt in the trail camera photographs.

a call from Becky after Amanda dropped her off. With Shaffer's permission, the officer checked the call log on her phone. He noted the only call Shaffer received was at 2:12 a.m. He asked Shaffer if he could use her phone to call the number so he could speak to Becky, and Shaffer agreed. When the officer called the number and asked for Becky, he was told he had the wrong number and had reached Amanda—Shaffer's coworker. Later, Shaffer admitted getting out of the vehicle while at Carroll's house and petting the dog. Later still, she said she went inside the residence to act as lookout in case anyone drove by. She eventually admitted carrying items out of Carroll's home; Shaffer never admitted starting the fires.[4]

Shaffer's response to all of this evidence against her is to proclaim she is innocent and that we should rely on the alibi provided by Fowler. In her deposition, Fowler claimed "the day that [Shaffer] had supposedly done this," Fowler was with her from noon until 2:45 a.m. But later in her deposition, Fowler was unclear what night she was talking about. At one point, she was confident the day they spent together was in the middle of the week. But June 2, 2013, was a Sunday. Once this inconsistency was pointed out to her, the following exchange occurred:

> Q. Okay. And if a review of a calendar shows that June 2 was on a Sunday— A. Then I was erred in my middle of the week.
> Q. So you would have gone out drinking Sunday night. A. The 2nd or the 3rd, so it would have been Monday night.
> Q. So you could have gone out drinking Monday night, the 3rd? A. Yeah. Bars wouldn't be open that late on Sunday.
> . . . .
> Q. So that's one absolute you can say: It was not on a Sunday. A. It was not on a Sunday.

---

[4] "Becky" was never identified or confirmed to exist.

After more questions by Shaffer's attorney, Fowler settled on the answer that she did not know what date she spent with Shaffer; she agreed "[i]t's possible [they] did this on Sunday, June 2, 2013. It's possible [they] did it on Monday, June 3. 2013." At best, Fowler has sworn she was with Shaffer some night into the next morning until 2:45 a.m.

Even if Fowler's claims were more steadfast, they would not overcome the strong evidence establishing Shaffer's guilt. First, Shaffer admitted to police she was in Carroll's home and stole things on the morning in question. Only after she made this admission, and after she already asked Amanda to provide an alibi and was rebuffed, did Fowler's ability to provide an alibi come up. Additionally, the claim that Shaffer was with Fowler rather than at Carroll's on the night in question is directly contradicted by evidence that includes surveillance footage and trail camera pictures; DNA testing; Shaffer's own statement to Amanda, which is supported by phone call logs; and stolen items found by police in Shaffer's possession.

The district court did not err in concluding Shaffer failed to prove these actual-innocence claims.

*2. Possession of Controlled Substances.* We recognize that within her argument section titled "actual innocence claim" in her appellate brief, Shaffer mentions her convictions for possession of controlled substances. But it is not clear she ever raised these issues to the district court, and, even if she did, she never got a ruling on them.

Part of the lack of clarity is due to the fact that Shaffer did not assert any claim of actual innocence until the day before the hearing on her PCR application.

Her claims in that March 28, 2019 filing are vague, but they seem to only reference her arson and burglary convictions. At the PCR hearing, the only mention of the possession charges was Shaffer's testimony—when asked if there was anything important she wanted to bring up—that her trial attorney was supposed to get the oxycodone and hydrocodone charges dismissed. She did not elaborate why those charges were supposed to be dismissed. Her post-trial brief was silent as to her possession convictions. In its ruling, the district court only considered Shaffer's claim of an alibi through Fowler—which has no relation to her possession convictions—before concluding, "Ms. Shaffer's claim of actual innocence must fail as she does not meet her burden of proof."

Insofar as she has raised these claims of actual innocence on appeal, they are not preserved for our review and we do not consider them. *See Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002) ("It is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we will decide them on appeal.").

**B. Ineffective Assistance of Counsel.**

Shaffer maintains she was denied effective assistance by trial counsel in five respects: (1) failing to pursue evidence of her innocence by not conducting adequate discovery; (2) instructing her to plead guilty; (3) misinforming her that she would receive concurrent rather than consecutive sentences; (4) allowing the sentencing proceedings to continue in spite of the fact she was on psychiatric medication and did not understand what was happening; and (5) failing to file an appeal of her sentence after she instructed him to do so. As with her actual-

innocence claims, it is unclear that any of these alleged errors relate to her possession convictions.

An applicant "alleging ineffective assistance of counsel must prove (1) counsel failed to perform an essential duty and (2) prejudice resulted." *State v. Carroll,* 767 N.W.2d 638, 641 (Iowa 2009). "To establish prejudice, [an applicant] must demonstrate 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Id.* (citation omitted). "In the context of a guilty plea, an applicant for [PCR] must prove 'a reasonable probability that, but for counsel's alleged errors, he [or she] would not have pled guilty and would have insisted on going to trial.'" *Id.* (second alteration in original) (citation omitted). "The probability of a different result must be 'sufficient to undermine confidence in the outcome.'" *Id.* (citation omitted).

*1. Conduct Discovery.* Shaffer argues her trial counsel breached an essential duty by failing to conduct adequate discovery. She maintains that if he had deposed Fowler and her fiancé, Stewart Wren, she would not have pled guilty because her innocence would have been established.

We have already pointed out the weaknesses of Fowler's deposition. Shaffer asserts that Fowler would have had a better memory if she was deposed in 2014 rather than 2016. But even if Fowler confidently testified that she was with Shaffer from Sunday, June 2 into the morning of Monday, June 3, this purported alibi would still have credibility issues as photographs, DNA testing, and Shaffer's own admissions contradict it by putting Shaffer at the scene of the arson and burglary.

Wren was not deposed until after Shaffer's guilty pleas, but he testified that on June 2, Shaffer "was there when [he] went to bed" "around 10-ish," and "she was there when [he] got up," on June 3, which "must have been 5:30, 6:00 [a.m.] at the latest."[5] In between those times—when the arson and burglary occurred—Wren agreed he had no knowledge whether Shaffer was in their apartment and agreed she could have left and come back without him knowing. It was pointed out to Wren that by Shaffer's own claims, she went out with Fowler on the night in question, and Wren then testified she may have but he is such a deep sleeper he never heard her leave. This is not an alibi at all. It provides no information about where Shaffer was at the time the actual crimes occurred. Plus it is contradicted by Shaffer's testimony at the PCR hearing that she was at work until 10:30 or 11 p.m. and then went to a bar with a coworker. It is also at odds with Fowler's claims—if we are to understand them to mean she spent June 2 into June 3 with Shaffer—that she was with Shaffer from noon until 2:45 a.m.

The discovery Shaffer claims should have been conducted leads to two separate, conflicting stories, neither of which match Shaffer's own testimony or which explain the physical evidence linking Shaffer to the scene of the arson and burglary. Shaffer has not proved counsel breached a duty by failing to take these depositions as part of her pre-plea discovery. This claim fails.

---

[5] Wren did not provide these dates. He testified he was "not specifically sure" about the date but he knew he was referencing when the arson and burglary occurred "[b]ecause [he] remember[ed] when she was arrested and all that, [he] remember[ed] the dates coming up, and that was the time that she was there in the apartment with me."

*2. Instruction to Plead Guilty.* Shaffer claims she only pled guilty because her trial counsel instructed her to do so. At the PCR hearing, Shaffer testified, "There was several different plea bargains, and I wasn't sure which one—I didn't want to accept any of them. He was the one who decided to accept it. I didn't give him that—I didn't tell him he could do that. I didn't agree with it."

But this claim is contradicted by the plea colloquy, in which Shaffer participated and agreed she wanted to plead guilty to the amended charges. Additionally, trial counsel testified credibly when he was deposed in the PCR action. The following exchange took place between Shaffer's PCR counsel and trial counsel during trial counsel's deposition:

> Q. Is it your testimony, though, that you let Ms. Shaffer decide whether or not to go to trial? A. I always let the client decide because, push come to shove, the judge will ask them if it's their decision.
> . . . .
> Q. And you did not in any way push, threaten or coerce her into taking a plea. A. I couldn't make her any promises one way or the other. I had nothing to coerce her with. I couldn't promise her anything. I thought we had a good chance at probation because of the amount of time she'd spent in jail leading up to the plea and sentencing. I could see a change in her from the time we went to sentencing as to when I first met her, the chance to be sober for an extended period of time, the chance to—for her to consider things that were going on in her life. I could see a change. I thought we had a good shot at probation. I thought we had a good argument.
> Q So it is your testimony, sir, that you let her decide whether or not to try the case. A Yes.
> Q You would disagree, then, if Marcia Shaffer testified that she asked you to go to trial and you told her you wouldn't. A Oh, I never told her I wouldn't. If I had had a case where, for some reason, I had chosen not to take it to trial, I'd just withdraw.

Shaffer has not proved she would have insisted to go to trial but for some breach of duty by counsel. This claim fails.

*3. Consecutive Sentences.* Shaffer claims counsel misinformed her that she would receive concurrent rather than consecutive sentences, which induced her to plead guilty. Again, Shaffer has nothing to support her claim but a bare assertion she made at the PCR hearing. And again, this claim is contradicted by the plea colloquy. At the beginning, the State verbally explained the plea agreement to the court, stating in part, "Also it is recommended and agreed upon that all four of these counts would run consecutive with each other and not concurrently whether or not the Court granted probation or incarceration was ordered." With Shaffer present, her trial attorney responded, "[T]hat is a correct statement of our plea agreement. . . . The parties are free to argue any legal sentence although we are both in agreement that these should run consecutive for 30 years. Is just a question whether or not Ms. Shaffer would be granted an opportunity for probation." Then, during the colloquy, the court asked Shaffer directly, "I want to put it on the record anyway, that you understand that the State is going to be recommending that these run consecutive to each other so that you could be sentenced to an indeterminate term not to exceed 30 years. Do you understand that?" Shaffer responded, "Yes."

Shaffer cannot establish that she was unaware she agreed to consecutive sentences before she entered her guilty pleas. Counsel did not breach an essential duty, and this claim fails.

*4. Medicated at Sentencing.* Shaffer maintains that due to psychiatric medication she was taking at the time of sentencing, she did not understand what was happening and her trial counsel should have stopped the proceedings.

At sentencing, Shaffer's trial attorney brought up the fact she told him she was on medication and asked if it "had an impact on [her] ability to think this morning and to be prepared . . . ?" Shaffer answered, "Well, yeah, to a certain extent." When asked to explain it to the court, Shaffer responded, "It just kind of dulls my senses, Gabapentin I'm on, I can't sometimes do a full sentence. When I'm trying to speak something, it doesn't come out right. But that's the only one it does it with." The court asked Shaffer if she had understood everything so far, and she said she had. The court then responded, "Here's what I'm going to tell you. If at any time you do not understand something that's going on, tell me, and we will go over it. I want to make sure that you do understand what's going on here today. Are you capable of doing that?" Shaffer said, "Yes."

It is unclear what more Shaffer contends counsel should do. Counsel alerted the court that Shaffer was on medication that had some impact on her. When asked about it more in-depth, Shaffer told the court she understood what was happening and would let the court know if that changed. Shaffer never did so.

While the record establishes that Shaffer was on medication at the time of sentencing, it does not establish Shaffer could not understand the proceedings. Furthermore, Shaffer has done nothing to establish that she suffered prejudice as result—a necessary component of a successful claim of ineffective assistance. Shaffer's alleged lack of understanding at sentencing does not impact her guilty pleas, entered five months earlier. She makes no argument that she received a different, harsher sentence because of this alleged impairment. She seems to assume it is per se prejudicial if a defendant struggles to understand the

sentencing proceedings, but she cites no authority to support any such premise. This claims fails.

*5. Failure to File an Appeal of Sentence.* Shaffer maintains she wanted her trial counsel to appeal her sentence but he failed to do so. Trial counsel was asked about this in his deposition, and he testified he had no independent memory of it. However, in reviewing his file, he found no note to file an appeal. He explained that he has a standard practice, stating, "I file notices of appeal many times, almost always after a trial if we don't get the verdict we want, and after some pleas. I make a note of it. We have a standardized form. A lot of times, just give it the secretary; they do it for us. . . ." The district court found this testimony from trial counsel more credible than Shaffer's assertion—corroborated by Wren in his deposition—that she asked for an appeal immediately after being sentenced. After our review of the record, we find no reason to disagree with the district court's credibility determination.[6]

Shaffer has not established that counsel failed to file an appeal she requested, and this claim fails.

---

[6] We recognize we generally "give weight to the lower court's findings concerning witness credibility." *Ledezma*, 626 N.W.2d at 141. But this deferential standard is based on the trial court's opportunity to observe the demeanor of the witnesses. *See, e.g.*, *Weaver v. State*, No. 04-0870, 2005 WL 600228, at *6 (Iowa Ct. App. Mar. 16, 2005). Here, the district court had only a transcript of the deposition of the trial attorney—not a live witness—and therefore had the same information we do when determining credibility.

**IV. Conclusion.**

Because Shaffer failed to establish either her claims of actual innocence or her claims of ineffective assistance of trial counsel, we affirm the denial of her PCR application.

**AFFIRMED.**