# IN THE COURT OF APPEALS OF IOWA

No. 23-1179
Filed October 2, 2024

**RICHARD ROBERT MUTCHLER,**
    Applicant-Appellant,

**vs.**

**STATE OF IOWA,**
    Respondent-Appellee.
_____

Appeal from the Iowa District Court for Polk County, Scott J. Beattie, Judge.

Richard Mutchler appeals the district court's denial of his application for postconviction relief. **AFFIRMED.**

Karmen R. Anderson of Anderson & Taylor, P.L.L.C., Des Moines, for appellant.

Brenna Bird, Attorney General, and Louis S. Sloven, Assistant Attorney General, for appellee State.

Considered by Schumacher, P.J., Sandy, J., and Bower, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2024).

**BOWER, Senior Judge.**

Richard Mutchler appeals the district court's denial of his application for postconviction relief following his 2010 convictions for two counts of first-degree murder. Mutchler claims his trial counsel was ineffective by failing to "prevent the jury from viewing" the bloody clothes he was wearing at the time of his arrest and question a witness "about his 911 call that occurred on the night" of the murders. Because Mutchler did not establish prejudice, his ineffective-assistance-of-counsel claims fail. Accordingly, we affirm.

## I.    *Background Facts and Proceedings*

In its ruling affirming Mutchler's convictions on direct appeal,[1] our court set forth the following background facts:

> From the evidence produced at trial, the jury could have found the following facts. In the early hours of July 10, 2008, Stanley Long and Charlene Ann Gordon were murdered in their homes in Des Moines in similar fashions. Both died of multiple stab wounds.
>
> Mutchler was acquainted with both victims. All three were crack-cocaine users, and Mutchler often smoked crack with each victim. Long had a reputation for being well-connected to suppliers of crack. He also had a reputation of borrowing money and being slow to pay it back. Long borrowed money from Mutchler in the past, and Mutchler had threatened Long, stating on one occasion that he would "mess [Long] up" if Long failed to repay him thirty dollars he had borrowed.
>
> On the evening of July 9, 2008, Long bought some crack and returned to his apartment to smoke it. A friend, who suffered from memory loss and paranoia from his crack use, came over at 6:30 p.m., and he and Long drank some beer. Long sought to obtain more crack, making calls to his contacts, but was unsuccessful. Around 8:30 p.m., Mutchler and Gordon stopped by Long's apartment, wanting to buy $100 worth of crack. Long told them he had been looking for some but had had problems finding any.

---

[1] On the same day, this court also affirmed Mutchler's direct appeal of a first-degree robbery conviction, which was tried separately from his murder charges. *See State v. Mutchler*, No. 11-0301, 2012 WL 3027097, at *8 (Iowa Ct. App. July 25, 2012).

Mutchler and Gordon left Long's apartment to find some crack, and they headed to an area in Des Moines known for drug sales and use. There, Gordon gave a drug dealer $30 for some crack, and Mutchler and Gordon sat in Gordon's vehicle awaiting the dealer's return with the crack. Mutchler was wearing whitish-colored sweat pants.

A prostitute, who knew Gordon, was best friends with the drug dealer, and had a long criminal record, was working the area where Mutchler and Gordon were waiting. The prostitute got in the backseat of Gordon's car and talked to Gordon and Mutchler while Gordon was waiting for the drug dealer to return. The prostitute observed there was a bunch of stuff in Gordon's car, but she did not see any stereo equipment in the car.

They were approached by a woman Mutchler used to date. The woman was an ex-prostitute and had several criminal convictions. She was also a drug user, as well as Gordon's former roommate. The woman and Gordon did not get along; there was a history of violence between them. Mutchler and Gordon asked the woman for some crack, and Mutchler also asked her where he could get a gun. In response to why he wanted the gun, Mutchler replied, "[Long] has [fifty dollars]; I want it." The woman told them she had some crack but was not going to get it out there. She told them she would bring it over to Gordon's apartment later, though she had no intention of doing so because she thought Mutchler "was just acting really weird," he "smelled like he had been drinking. . . . And [he was] just being very aggressive with [her]." She then left.

At approximately 10:00 p.m., Gordon gave up on waiting for the drug dealer to return and she left, leaving Mutchler and the prostitute behind. Gordon encountered the drug dealer a block away, and he gave her the crack. She left and did not return to Mutchler and the prostitute's location. The dealer did return to the location, and Mutchler asked him where the crack was. After being told that he had given it to Gordon because she paid for the drugs, Mutchler became mad and extremely agitated. He told the dealer, "You shouldn't have did that." The prostitute told the dealer that he needed to get Mutchler out of there. Two more of the dealer's customers pulled up in a truck. The dealer asked them if they would give Mutchler a ride. They agreed, and Mutchler hopped in the truck. Mutchler told the driver his old lady had his "stuff," and Mutchler directed the driver to a location between 15th and 16th on Grand. This location was less than a block from Gordon's apartment. The driver saw Mutchler stagger across the street in front of his truck. He did not know where Mutchler went from there.

Meanwhile, Long continued his search to obtain some more crack. After obtaining a small amount, Long and his friend smoked it at Long's apartment. Between 10:15 and 10:45 p.m., Long's friend left to get beer. When he returned, Mutchler was there. He did not

see Gordon. Long's friend saw Long was getting ready for bed and left. He did not see Long again.

Another friend of Long's came to Long's apartment between 11:00 p.m. and midnight to pick Long up, after receiving a call that someone had some crack for him. This friend did not go inside Long's apartment. He and Long left to get the crack, and the friend dropped Long back home after getting the crack between midnight and 12:30 a.m. on June 10.

Between 1:00 and 2:00 a.m., Gordon's next-door neighbors awoke from their sleep, hearing pounding on Gordon's door so loud they believed some kind of object was used to make the sounds. Gordon was heard screaming and moaning. The neighbors went back to sleep without calling the police.

At 6:30 or 7:00 a.m., the drug dealer was at Sam Heard's thrift shop, located near the known drug area where he, Mutchler, and Gordon had been the night before. While the dealer was waiting for someone, Mutchler walked up on foot to the shop and asked the dealer to help him start a car. Mutchler's pants and shirt had blood all over them. After asking Mutchler what happened, Mutchler stated he had been "in a bar and had almost snatched some guy's arm off or something." They walked about seven blocks to the car, which was Gordon's. Gordon was not there, but Mutchler had her keys. Mutchler and the dealer were unsuccessful at starting the car, and the dealer ultimately returned to Heard's shop. While the dealer was waiting for Heard to show up, Mutchler, driving Gordon's car, parked at Heard's. Mutchler turned the car off, and it would not start again. At that point, the dealer saw there were a television, a DVD player, and a stereo in the backseat of the car. Mutchler asked the dealer if he knew anyone who wanted to take the equipment, and the dealer told him it was too early. Mutchler and the dealer pushed the car about 200 feet, and the dealer left Mutchler.

Shortly after 8:00 a.m., Mutchler attempted to steal a car battery from a parked car at a service station. The station's owner saw Mutchler and confronted him; Mutchler claimed he needed the battery from his wife's car to start his own car, pointing to Gordon's car parked in the street. The owner thought Mutchler seemed nervous and that he might become violent. Mutchler ran away thereafter, and the owner called the police.

Around 9:15 a.m., Mutchler was seen going into Long's apartment. Mutchler's pants were stained with what appeared to be blood. Mutchler was later seen at a bus stop wearing sweatpants with red spots that looked like blood.

After Long failed to arrive at work that morning, a family member stopped by Long's apartment to check on him and found Long lying dead with multiple stab wounds. Police were dispatched to Long's apartment at 11:00 a.m. that morning. On the floor of the apartment, officers found Long's wallet with its contents pulled out

and scattered about. Officers also found a key ring with a key and identification cards bearing Gordon's name.

After noon the same day, Gordon was discovered lying dead in her apartment with multiple stab wounds, similar to those found on Long. The contents of Gordon's purse were emptied and scattered about. Mutchler's billfold with his driver's license was found under a chair near Gordon's body. Also nearby was a small pile of mail and mailed glossy advertisements. A shoeprint in what appeared to be blood was found on one of the advertisements, and the shoeprint matched Mutchler's shoe. Mutchler's DNA was found on two liquor containers in Gordon's apartment.

Mutchler was arrested at 7:00 p.m. that day. At that time, Mutchler was wearing a blue shirt and denim shorts covered with blood. Most of the blood had resulted from an earlier incident between Mutchler and Heard. However, a smear of blood matching Heard's DNA profile and Gordon's DNA profile was found on Mutchler's big toe, though it could not be determined whether Gordon's DNA came from blood.

The television, DVD player, and stereo found in Gordon's car belonged to Long. A smear of blood containing Long's DNA was found on one of the stereo speakers. Additionally, bloodstains found on the driver's side floor mat and a sock in the car matched Gordon's DNA.

*State v. Mutchler*, No. 11-0007, 2012 WL 3026914, at *1–3 (Iowa Ct. App. July 25, 2018) (alterations in original). This court rejected Mutchler's challenge to the sufficiency of the evidence supporting his convictions and his claim of ineffective assistance of counsel relating to trial counsels' failure to pursue severance of the murder charges. *Id.* at *3–6. The court preserved Mutchler's pro se claims of ineffective assistance of counsel for a possible postconviction relief (PCR) proceeding. *Id.* at *6.

Mutchler filed a PCR application, raising various claims of ineffective assistance of counsel. Following the PCR trial,[2] at which Mutchler testified, the district court denied the application. Mutchler appeals.

---

[2] Mutchler filed his PCR application in 2014. After several continuances and changes in counsel, the application came before the court for trial in 2023.

## II. Standard of Review

"We ordinarily review PCR rulings for correction of errors at law." *Brooks v. State*, 975 N.W.2d 444, 445 (Iowa Ct. App. 2022). "However, when the applicant asserts claims of a constitutional nature, our review is de novo." *Ledezma v. State*, 626 N.W.2d 134, 141 (Iowa 2001). Accordingly, "we review claims of ineffective assistance of counsel de novo." *Id.*

## III. Discussion

Mutchler raises two ineffective-assistance-of-counsel claims on appeal. First, he challenges trial counsels' failure to object to the admission of bloody clothes he was wearing at the time of his arrest. According to Mutchler, "the bloody clothing was unfairly prejudicial evidence that contained little to no probative value." At the outset, we observe trial counsel filed a motion in limine attempting to exclude the bloody clothes. In his deposition, however, trial counsel acknowledged, "[t]he evidence [e]ffectively related to the testimony on those matters we had determined was going to be coming in anyway. . . . I don't know that we had a huge argument to keep it out." With that in mind, and also being accustomed to the prosecutor's "difficult way about him for trial" (including using the rules relating to witnesses "to his advantage"), trial counsel entered an agreement with the prosecutor to withdraw Mutchler's objection to the evidence in exchange for access to the State's witness schedule at the beginning of trial and the State's agreement Long's son would not testify about purchasing the clothes.[3] Mutchler acknowledges Long's son's identification of the clothes was a "viable

---

[3] Long's son was expected to testify about having purchased the clothes found on Mutchler for his father.

legal issue," but he persists "the impact could have been lessened through a photograph, especially one that was not in color."

Mutchler also claims trial counsel was ineffective by failing to question Rex Rhiner "about his 911 call that occurred on the night" of the murders.[4] Rhiner, who was friends with Long, had been hanging out with Long at Long's apartment hours before the murder. One of the defense's strategies was to create a question as to whether Rhiner was Long's killer. During cross-examination, trial counsel elicited testimony from Rhiner regarding discrepancies in his story; his odd statements to police; and his "us[e of] crack cocaine, alcohol, and prescription drugs together" on the night of the murders. Rhiner eventually acknowledged, "Well, it didn't look good, you know, that I was there that night, you know." Counsel also asked Rhiner if he made "some calls" that night, to which Rhiner responded he "may have." Counsel then asked Rhiner specifically about his calls to "the Parrish law firm at 2:00 a.m.," to which Rhiner agreed he made but stated he was just "screwing around." Counsel also questioned a detective about Rhiner's phone calls, eliciting the detective's agreement that Rhiner called "911" right before he called the Parrish law firm. Counsel asked the detective whether police had requested "a 911 transcript made in relation to that call," to which he responded, "I didn't do it, and I don't know if [the other detective] did or not." Trial counsel acknowledged he neither questioned Rhiner about the call nor attempted to obtain a transcript of the call from police. As counsel explained:

> Let's just be frank. If we go request the 911 call, the first call that
> Des Moines PD is making is to the detective and the county attorneys

---

[4] We note Mutchler presented no evidence relating to how further evidence of the 911 call would have been beneficial to his defense.

on the case. And if that call is completely unrelated to anything that happened, we lose all ability to make that argument and that insinuation.

And as we sat here, part of my memory is jogged that this, for lack of better term, goofball that made this call, if I remember, his response as to why he was calling the Parrish Law Firm in the middle of the night was due to some civil case or small claims case or some BS answer that just didn't match. And it allowed us to, again, make an argument and an insinuation that, if the transcript had been gotten, would have been blown away, quite frankly. And we wouldn't have been able to do that.

To establish ineffective assistance of counsel, Mutchler must show "(1) counsel failed to perform an essential duty and (2) prejudice resulted." *State v. Keller*, 760 N.W.2d 451, 452 (Iowa 2009) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). "If the claim lacks prejudice, it can be decided on that ground alone without deciding whether the attorney performed deficiently." *Ledezma*, 626 N.W.2d at 142. In other words, even if we found counsel failed an essential duty, Mutchler must prove he was prejudiced by the admission of the challenged evidence and counsels' failure to elicit further testimony about Rhiner's 911 call.

Under these facts and circumstances, we find any alleged deficiency by counsel did not affect the outcome of trial. Neither of Mutchler's claims relate to the circumstantial and physical evidence connecting him to both murders. Accordingly, he has not shown "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 143 (quoting *Strickland*, 466 U.S. at 694). As this court previously observed,

Here, numerous witnesses acquainted with Mutchler, Long, and Gordon testified as to Mutchler's actions the night prior to and the day of the murders, and their circumstantial evidence raises a fair

inference of guilt as to each essential element of the crime. Mutchler's trial counsel questioned the witnesses' testimony, specifically challenging their credibility on cross-examination. The members of the jury were free to believe or disbelieve these witnesses' testimony and to give the testimony such weight as they thought the testimony should receive.

. . . In Gordon's apartment, Mutchler's fingerprints were found on containers and a shoeprint in what appeared to be blood matched Mutchler's shoe. A smear of blood matching Gordon's DNA profile was found on Mutchler's big toe. Bloodstains found on the driver's side floor mat and a sock in Gordon's car, which had been in Mutchler's possession, matched Gordon's DNA. The television, DVD player, and stereo found in Gordon's car and seen with Mutchler while in possession of the car belonged to Long. A smear of blood containing Long's DNA was found on one of the stereo speakers.

*Mutchler*, 2012 WL 3026914, at *4–5 (internal citation omitted). Accordingly, Mutchler's claims of ineffective assistance of counsel fail. We affirm the court's denial of Mutchler's PCR application.

**AFFIRMED.**