# IN THE COURT OF APPEALS OF IOWA

No. 24-1220
Filed August 20, 2025

**PERRY DALE VANDEKIEFT,**
    Applicant-Appellant,

**vs.**

**STATE OF IOWA,**
    Respondent-Appellee.
_____

Appeal from the Iowa District Court for Lyon County, John M. Sandy, Judge.

The applicant appeals the denial of his postconviction-relief application. **AFFIRMED**.

Kent A. Simmons, Bettendorf, for appellant.

Brenna Bird, Attorney General, and Joseph D. Ferrentino, Assistant Attorney General, for appellee State.

Considered without oral argument by Greer, P.J., and Badding and Chicchelly, JJ. Sandy, J., takes no part.

**GREER, Presiding Judge.**

Perry VanDekieft[1] was convicted of sexual abuse in the second degree for his actions against his stepdaughter, C.L., and sentenced to twenty-five years in prison. On appeal from the denial of his application for postconviction-relief (PCR), he argues his trial counsel was ineffective for failing to show C.L. had a character for untruthfulness, to object to expert testimony concerning grooming, and to articulate potential motives C.L. had in making sexual abuse allegations. We affirm the denial of his PCR application.

## I. Background Facts and Proceedings.

Perry directly appealed his conviction to this court in 2018. We summarized the pertinent underlying facts as follows:

> Perry and Tari VanDekieft married in September 2009. She called him her "best friend," and he considered her the same. In August 2014, the couple moved into a home in rural Inwood located in the salvage yard where they worked. The couple lived in the home with their children, including A.V., their daughter who was born during the marriage, and C.L., Tari's daughter from a previous marriage who was born in 2004. Perry is C.L.'s stepfather.
> . . . .
> On the afternoon of Sunday, July 31, 2016, Perry and Tari were working outside while C.L. washed dishes alone inside the house. At one point, Perry went into the house to refill his coffee cup. Shortly thereafter, Tari also went inside to grab a tool. When Tari stepped inside, she saw C.L. standing at the sink with Perry standing right behind her and their backs turned to Tari. Perry was surrounding C.L. with his arms and kissing her on the back of her neck. According to Perry's testimony, C.L. felt bad about her recent haircut at the time, so he hugged and kissed her from behind and told her, "I love you. I think you're pretty." He testified he only wanted her to feel good about herself, and he denied wanting any sexual benefit from her. Tari testified that when Perry heard her shut the front door, he jumped back seemingly startled, went to the coffee counter, and then went outside without saying anything.

---

[1] The capitalization and spacing of the applicant's last name are inconsistent throughout the record. We maintain the capitalization and spelling used by this court in Perry's direct appeal and—as we did before—use his first name in the body of the opinion.

Tari talked to C.L. about the encounter that afternoon, but she never talked to Perry about it. Suspicious as to what she had observed, Tari began paying more attention to Perry's interactions with C.L. The next evening, on Monday, August 1, 2016, Perry took C.L into the girls' bedroom to tuck her into bed as usual. Tari soon noticed C.L. had not finished her chores, and she went to the girls' bedroom to tell her. From the doorway to the girls' bedroom, Tari saw C.L. lying in her bed and playing with her phone. Perry was also lying in her bed with his back to the doorway, his feet dangling off the bed near C.L.'s head, and his face next to her hip. Tari testified Perry was using his hand to rub C.L. over her clothes on her hip and on the front of her thigh in a "suggestive" and "inappropriate" manner.

Tari did not talk to Perry about what she saw that Monday night, but she tried to keep Perry from being alone with C.L. until C.L.'s regular counseling appointment on Thursday. At the Thursday counseling appointment, Tari asked C.L. about the Monday night incident and if anything else had happened.

At trial, C.L. testified about her interactions with Perry. The touching events usually occurred at night. He typically used his hand to touch her on her legs, thighs, and butt while he called her terms like "sexy" and "pretty." He touched her over her clothes and on her bare skin, occasionally pulling her underpants down to her knees. On the night of Monday, August 1, 2016, he rubbed and kissed her legs and told her she was "sexy" and "pretty" while he laid with her in her bed. He first touched her when she was in second or third grade, at which time he rubbed her legs and said "you don't have to sleep with your clothes on. You can sleep [naked] like I do." He touched her more frequently at night by 2014, and he touched her almost every night by 2016. One night around March 2016, he entered her room, pulled down her pants, kissed and rubbed her bare butt, and rubbed the outside of her bare vagina with two fingers. A couple of years earlier, when C.L. was in fifth grade, Perry rubbed her breasts over her clothes and commented on how they were developing.

. . . .

The State charged Perry with sexual abuse in the second degree. The parties proceeded to a jury trial. At trial, the State offered testimony from Tari, C.L., deputy [Jerry] Birkey, and Victoria Hilton. Hilton is a child forensic interviewer who interviewed C.L. on August 5, 2016; however, the State offered her as an expert witness to testify generally about interviewing children regarding sexual abuse. Hilton did not testify about C.L. beyond acknowledging her interview. Perry testified in his defense. . . . The jury convicted Perry of sexual abuse in the second degree in violation of Iowa Code section 709.3(1)(b) (2016), and the court sentenced him to twenty-five years imprisonment.

*State v. Vandekieft*, No. 17-0876, 2018 WL 2727720, at *1–3 (Iowa Ct. App. June 6, 2018)

(footnote omitted). On direct appeal, Perry argued, "the district court abused its discretion

in allowing testimony from Hilton, the court erred in allowing Tari to present hearsay testimony, and the prosecutor committed misconduct." *Id.* at \*3. He also raised an ineffective-assistance-of-counsel claim related to trial counsel's failure to object to a jury instruction. This court found each of his claims meritless.

Perry timely applied for PCR on February 25, 2021. The State moved for summary judgment, which was denied. After twice amending his PCR application, Perry proceeded to trial. Finding that Perry failed to prove his trial counsel was ineffective, the district court denied his PCR application. Perry appeals.

## II. Standard of Review.

"We review de novo PCR claims of ineffective assistance of counsel." *Trane v. State*, 16 N.W.3d 683, 692 (Iowa 2025).

## III. Discussion.

Perry argues his trial counsel was ineffective for (1) failing to investigate, prepare, and present character evidence at trial to show that the child's mother believed the child was an untruthful individual, (2) failing to properly object to expert testimony concerning grooming, and (3) failing to investigate and present evidence showing the child's motive to "falsely accuse" him. He maintains that the cumulative error of these failures was unfairly prejudicial.

"To prevail on a claim of ineffective assistance of counsel, the applicant must demonstrate both ineffective assistance and prejudice." *Ledezma v. State*, 626 N.W.2d 134, 142 (Iowa 2001); *see Strickland v. Washington*, 466 U.S. 668, 687 (1984). "However, both elements do not always need to be addressed." *Ledezma*, 626 N.W.2d

at 142. If the applicant fails to show either prejudice or ineffective assistance, the entire claim fails. *See id.*

To satisfy "the first prong, the applicant must demonstrate the attorney performed below the standard demanded of a reasonably competent attorney." *Id.* "[C]laims of ineffective assistance involving tactical or strategic decisions of counsel must be examined in light of all the circumstances to ascertain whether the actions were a product of tactics or inattention to the responsibilities of an attorney guaranteed a defendant under the Sixth Amendment." *Id.* at 143. "Miscalculated trial strategies and mere mistakes in judgment normally do not rise to the level of ineffective assistance of counsel." *Id.* "We presume the attorney performed competently, and the applicant must present 'an affirmative factual basis establishing inadequate representation.'" *Millam v. State*, 745 N.W.2d 719, 721 (Iowa 2008) (citation omitted).

"Once the applicant proves ineffective assistance, it must also be shown that the error caused prejudice." *Ledezma*, 626 N.W.2d at 143. To show prejudice, the second prong, "the applicant must demonstrate 'that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Id.* (quoting *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* (quoting *Strickland*, 466 U.S. at 694).

## A. Character of Untruthfulness.

After the mother reported Perry's sexual behavior toward C.L., the State filed charges in August 2016. In mid-October, the mother went to the Lyon County law enforcement center and met with a deputy to urge him to consider that the child was

untruthful. That October interview was recorded and at some point given to Perry's trial counsel. The mother also played for the deputy a recording during which the mother attempted to get the child to recant the allegations; the child never did. Despite the mother's October 2016 urgings, the mother was firm that the child was truthful in her March 2017 deposition:

> Q. At any time since August 4, 2016, between August 4, 2016, and October 2016, has [C.L.] ever recanted anything she said? A. No, sir.
> Q. Do you have reason to believe anything she may have said was untrue? A. No.
> Q. Since October 2016, to the present date, has [C.L.] ever indicated to you that anything she has ever said is untrue? A. No.
> Q. Or do you have reason to believe it untrue? A. No.

And while trial counsel did not ask about the interview with the deputy specifically in that deposition, he did mention that Tari had gone into the law enforcement center to see the deputy in October.

Pointing to the October interview, Perry makes two assertions concerning his trial counsel's failure to show the child's untruthfulness; that trial counsel: (1) failed to investigate the mother's assertions that the child was untruthful and (2) failed to present evidence of her untruthfulness through Tari's testimony. To that end, Perry asserts that trial counsel should have used the information to impeach the mother's trial testimony over the child's allegations or at least explored the contradiction in her deposition. Perry contends that his trial counsel never reviewed the interview, but trial counsel's PCR testimony implies otherwise. Trial counsel had a physical copy of the interview with the mother, and although he had a "vague recollection" about the videotaped interview and the specifics of the discussion, trial counsel confirmed that he "did communicate with her.

They called quite a bit." And he knew that Tari presented an "issue leading up to trial, that [C.L.] was untruthful."

After Tari went to speak with the deputy, the Iowa Department of Health and Human Services removed C.L. from the family home,[2] and Tari testified at the PCR hearing that she was compelled to cooperate with the State to avoid having her other children removed from the home as well. Around this same time, in violation of the no contact order, Tari had reconnected with Perry.

But as it related to use of the recorded interview between Tari and the deputy, trial counsel was asked about his trial strategy in his deposition taken for the PCR proceeding:

> Q. If you had seen a video of Tari trying to convince the [deputy] that [C.L.] was untruthful, do you think that would have affected your judgment of whether to approach that characteristic with Tari as a witness? A. Not in this case.
> Q. And why is that? A. I mean, I would be aware of it. In this case, I just had the feeling at all stages of the proceeding that we were running into a wall here. And sometimes you can befuddle the jury more than you can gain from something like that.

Likewise, trial counsel described C.L. as one of the best witnesses he had ever seen in his long career as a prosecutor and defense attorney and that the jury in the case was one of the "coldest" he had ever experienced. Further, trial counsel knew Perry would not present well to the jury because the county was small and "conservative" and everyone would know the home at the salvage yard was "appalling"—"to say it was bad would be an understatement." Trial counsel testified that taking on the child victim, who presented well, could be counterproductive, so the strategy was to show that motive came into play and the child would say anything to get away from living at the salvage yard.

---

[2] According to PCR testimony, efforts to get C.L. to recant led to some physical altercations between Tari and the child.

Finally in the underlying trial, without hesitation, Tari described the kissing incident at the sink and offered she did not like what she saw, stating: "It looked very suggestive to me" and "[i[t looked inappropriate. It is not something my father would have done to me." Then as to the bedroom incident, Tari testified she talked to C.L. about it and that the child said "yes" when asked "if [Perry] had ever gone under her underwear." Trial counsel felt he could not risk alienating the jury by attempting to use the mother against the child, who was an excellent witness. And as trial counsel noted, "There was probably as many statements or indications by Tari at the outset that the daughter is truthful and others around her, as opposed to statements that she was not truthful as the matter progressed." Plus, when Tari was asked at the PCR trial as to whether she would have been willing to testify to her daughter's alleged penchant for untruthfulness at trial, she responded[3]:

> Q. And how do you believe you would have responded at the trial if that question were asked of you? A. I'm not sure how I would have answered. I would like to say, you know, that I would have said that I didn't believe her, but I had eyes on me and I was afraid to say anything at all. So I don't know if I would have been able to speak up. I don't know if I would have been strong enough to do so.
> Q. *You don't know if you would have been able to tell the jury that [C.L.] was an untruthful person?* A. *Exactly.*

(Emphasis added.) Trial counsel decided against questioning the child's character for untruthfulness and opening the door to cross-examination on Tari's inconsistent statements. At bottom, counsel decided juxtaposing a compelling child witness against

---

[3] The mother testified at Perry's PCR hearing that she was not free to testify truthfully at the criminal trial because the State threatened, implicitly or explicitly, to remove her other children from her care. Perry does not raise this claim, so we do not address the mother's contentions.

her mother, a reluctant witness with inconsistent testimony, was not a winning defense strategy. He explained as much at the PCR hearing:

> Q. Do you recall before trial did you ever develop any tactic or strategy of attempting to have Tari Vandekieft testify that [C.L.] was an untruthful person? A. Yes and no. Did I consider that? Yes. Did I consider the idea of a potential instruction where you might have—that you might get in that the witness or try to put in some kind of evidence regarding the victim's character? Yeah, I considered that.
> Q. And did you dismiss that idea from your trial strategy? A. I won't say I dismissed it, but I didn't run hard with it. The young girl was a very, very effective witness, just very effective witness. That's what I can say. I set that aside for that, in that light.

"We presume the attorney performed competently, and the applicant must present 'an affirmative factual basis establishing inadequate representation.'" *Millam*, 745 N.W.2d at 721 (citation omitted). Perry offers nothing to show trial counsel failed to "run-down" potential theories of the case by reviewing Tari's interview with the deputy or that the strategy, although unsuccessful, was outside the bounds of what a competent trial attorney might chose. With nothing more than bare assertions, Perry fails to carry his burden to provide "an affirmative factual basis" showing ineffective assistance. *See id.* Reviewing these facts as a whole, we find trial counsel's strategic decision not to present a defense questioning the child's credibility through the mother's testimony was a decision consistent with a reasonably competent attorney. So counsel did not render ineffective assistance. Perry's first ineffective-assistance-of-counsel claim fails.

## B. Testimony about Grooming.

Perry asserts trial counsel failed to offer the correct objection to testimony from the forensic interviewer, Hilton, explaining the concept of grooming.[4]  In the direct appeal, we described the lead-up to the admission of Hilton's testimony about grooming by noting that the district court responded to Perry's motion in limine in a written order that stated:

> After examining the authorities cited, including *State v. Dudley*, 856 N.W.2d 668 (Iowa 2014), the Court thinks that limited testimony concerning grooming is admissible.  To that extent, [Perry's] motion in limine is overruled.  The Court expects that the "grooming" testimony would be offered in general terms.  The Court thinks it may be admissible, on a proper foundation, to explain delayed reporting or partial or incomplete reporting.  Testimony that C.L. might suffer child sexual abuse accommodation syndrome will not be permitted.  Testimony that [Perry] is a groomer and that groomers are molesters will not be permitted.  Testimony that [Perry] and his conduct fit a profile of child molesters will not be permitted.  Testimony, including opinions, vouching directly or indirectly for the veracity of C.L. will not be permitted.

*Vandekieft*, 2018 WL 2727720, at *3.  Perry's trial counsel again raised an objection to the testimony about grooming during trial and prior to Hilton's testimony, and the district court stated:

> You know, we considered this at some length following the submission of your motion in limine.  And it's kind of an old saw, but I think that the arguments you made should form part of your cross-examination and argument.  I think that, assuming a proper foundation is laid in open court with respect to her proposed testimony, then I think that her testimony is admissible given Iowa—customary Iowa rules on the admission of expert testimony, and that it will then be to—the trier of fact will most certainly be instructed to disregard all, part or none of any expert witness's testimony just like any other witness.  They should consider the strength of the opinion and qualifications and all those things.  And in Iowa so far the strong message from our supreme court is that we trust the jury's—common sense of Iowa juries to see through the junk science.

---

[4] At trial, Hilton testified that "[g]rooming is basically a pattern of behavior that gains—establishes a relationship with a child.  Sort of establishes trust, establishes the child's participation, while sort of gradually introducing more explicit material or behaviors."

*Id.* at \*4. Given this procedural history, the State argues that Perry's arguments pertaining to Hilton's testimony about grooming were presented, argued, and ruled upon on direct appeal.

But Perry claims that his arguments raised in the PCR proceeding and now on appeal differ from the argument he raised on direct appeal as his instant argument focuses on counsel's failure to object under Iowa Rules of Evidence 5.403, 5.404(b), and 5.405 and as outside the scope of the district court's limine ruling. He claims these arguments were not addressed by this court on direct appeal. Turning to the treatment of the grooming issue on direct appeal, where our court found Perry had not preserved error, we stated:

> The district court's written response permitted Hilton to present "limited testimony concerning grooming.". . . .
>
> Even if Perry had preserved error on the issue, his argument would fail. Iowa has "a liberal view on the admissibility of expert testimony." Perry correctly notes an expert witness may not directly or indirectly comment on the credibility of a witness. However, we have long allowed experts to "express opinions on matters that explain relevant mental and psychological symptoms present in sexually abused children." An expert witness may "testify generally that victims of child abuse display certain demeanors." If "an expert witness testifies a child's demeanor or symptoms are consistent with child abuse, the expert crosses that very thin line and indirectly vouches for the victim's credibility, thereby commenting on the defendant's guilt or innocence."
>
> Hilton acknowledged she interviewed C.L. but stated she would not give an opinion on the credibility of C.L. Hilton otherwise did not testify about C.L. She only testified generally about the behavior of child sexual abuse victims, including testimony about why victims may delay disclosure of the abuse. Hilton did not directly or indirectly compare C.L.'s behavior to a child abuse victim. Therefore, even if Perry had preserved error on Hilton's testimony about delayed disclosure, he has not shown the district court erred in admitting her testimony.

*Vandekieft*, 2018 WL 2727720, at \*4–5 (internal citations omitted).

Although Perry's claims are now characterized as an ineffective-assistance-of-counsel challenge, on direct appeal we found in the alternative that if Perry had preserved the issue for our review, we would conclude that admitting the general broad testimony related to grooming was not in error. *Id.* We agree with that conclusion and see no reason to address the subject again. *See* Iowa Code § 822.8 (2021).[5] "A post-conviction proceeding is not intended as a vehicle for relitigation, on the same factual basis, of issues previously adjudicated, and the principle of [r]es judicata bars additional litigation on this point." *See Holmes v. State*, 775 N.W.2d 733, 735 (Iowa Ct. App. 2009) (citation omitted).

C.L. testified that starting in second or third grade, Perry began to touch her inappropriately and that behavior escalated as she grew older to include touching her genitals and breasts. By the time of trial, when she was a seventh grader, the touching had occurred almost 700 times over the previous two years. Trial counsel questioned C.L. and confirmed she knew about "good and bad touch" and pointed out she did not tell anyone about Perry's behavior. When Hilton testified about grooming, it was in broad terms—not specific to the individuals in the case—and explained why a child might not report what is occurring. "Expert testimony in child sexual abuse cases can be very beneficial to assist the jury in understanding some of the seemingly unusual behavior

---

[5] Section 822.8 provides:

> All grounds for relief available to an applicant under this chapter must be raised in the applicant's original, supplemental or amended application. Any ground finally adjudicated or not raised, or knowingly, voluntarily, and intelligently waived in the proceeding that resulted in the conviction or sentence, or in any other proceeding the applicant has taken to secure relief, may not be the basis for a subsequent application, unless the court finds a ground for relief asserted which for sufficient reason was not asserted or was inadequately raised in the original, supplemental, or amended application.

child victims tend to display." *State v. Leedom*, 938 N.W.2d 177, 192 (Iowa 2020) (citation omitted). Here, Hilton did not vouch or testify as to the credibility of the child or cross any line established by our case law. *See Dudley*, 856 N.W.2d at 677 (holding the child forensic expert was not allowed to comment—directly or indirectly—on another witness's credibility.) As a result, the district court was within its discretion in allowing the general testimony about grooming.

To the extent Perry argues that trial counsel failed to make other arguments[6] that may have restricted or prohibited the testimony about grooming and that Perry should now be able to raise them in the PCR action, we conclude our previous ruling on the admission of the testimony prohibits our relitigating the issue, and we do not find Perry's arguments related to our rules of evidence have merit.[7] This claim of ineffective assistance of counsel involving Hilton's testimony fails.

---

[6] Perry relies on *State v. Payton*, 481 N.W.2d 325 (Iowa 1992) as support for his argument that the expert's testimony about grooming would have been excluded if trial counsel had argued it could only be used as rehabilitative evidence in rebuttal. But *Payton* is not definitive as to whether testimony about grooming must be rehabilitative, as the State did not challenge that concept and it became the law of the case. 481 N.W.2d at 327–28. Instead, the *Payton* court found the expert's "testimony was rehabilitative, a characteristic in no way altered because it occurred during the State's case in chief." *Id.* And other caselaw addresses the issue more definitively than *Payton*. In *State v. McEndree*, No. 12-0983, 2013 WL 3458217, at *8 n.7 (Iowa Ct. App. July 10, 2013), we recognized that "[t]he rehabilitation 'limitation' of such expert witness testimony has not been followed." *See also State v. Seevanhsa*, 495 N.W.2d 354, 357 (Iowa Ct. App.1992) (allowing an expert to testify generally to child sexual abuse accommodation syndrome testimony, including mental and psychological symptoms present in a sexually abused child, during the State's presentation of evidence); *State v. Meyers*, 799 N.W.2d 132, 137–38, 146–47 (Iowa 2011) (allowing expert testimony "based on the facts and inferences from the evidence established at trial that a person in [the victim's] situation would have been unable to consent to a sex act" even though the testimony was not rehabilitative).

[7] As to the rules Perry references, rule 5.403 allows the exclusion of relevant evidence if the evidence is unfairly prejudicial, but we think this court's prior opinion, in context, suitably addresses and rejects any argument that Hilton's testimony was unfairly

## C. Motive.

Perry argues counsel breached a professional duty by failing to make reasonably competent efforts "to develop testimony and argument showing C.L.'s motive to falsely accuse Perry as a means to escape the person who was the disciplinarian in her home and as a means to escape the shame and bullying that she endured because she lived in a junkyard." As discussed above, trial counsel explained in the PCR trial that he had to carefully craft a theme to not directly call out C.L. as a liar, as she was one of the best witnesses he had ever seen, but instead, to direct the jurors to accept that C.L.'s motive was to remove herself from the junkyard. On our review, we find trial counsel carefully navigated that theme in presenting a defense at trial. While there may have been other viable strategies, we find trial counsel's conduct was within the realm of a reasonably competent attorney.

Before trial, counsel asked Tari and Perry about the roles they played in C.L.'s life. According to counsel, Perry admitted he was the disciplinarian of the family in the lead-up to trial. Counsel then reiterated his status as a disciplinarian when questioning Perry:

> Q. As a parent between you and Tari, who was the disciplinarian? Who's the one that finally called the ball at the end of the day? A. Me and Tari tried to share that aspect. But to my preference Tari wasn't strict enough. There was no order. She would allow things that I would not.

---

prejudicial to Perry, precluding a claim under rule 5.403. Rules 5.404(b) and 5.405 deal with character evidence. Rule 5.404(b) prohibits evidence of other acts to prove a person acted in accordance with their character, and rule 5.405 articulates the methods of proving the character of a witness. In Hilton's testimony, there was no specific evidence related to Perry or his character nor would it have been permissible. These are meritless arguments. *State v. Graves*, 668 N.W.2d 860, 881 (Iowa 2003) ("Trial counsel has no duty to raise an issue that has no merit.").

Similarly, during her testimony, Tari agreed that Perry was generally the disciplinarian in the family.  This testimony is sufficient to indicate to the jury that Perry was strict with C.L. and had a different style of parenting than C.L.'s mother.

Next, Perry argues counsel did not adequately investigate or introduce evidence demonstrating "the shame and bullying" C.L. experienced as a result of living at the salvage yard.  But we find counsel elicited testimony of C.L.'s view of the salvage yard during trial:

> Q. You don't like the salvage yard?  A. I have some good memories there from playing outside with my siblings.
> Q. But you don't like it there?  You don't want to go back there?  A. No.
> Q. You consider it dirty?  A. Yes.
> Q. You're embarrassed by Perry because you don't have any money?  A. Not really, no.  It's not the money part.  It's the fact that he doesn't clean up—he won't clean—he refuses to clean up around that place.
> . . . .
> Q. The house is dirty; correct, or what you believe to be dirty?  A. It's dirty, but I wouldn't be too embarrassed by it.
> Q. But you don't want to live there?  A. Correct.

And then counsel asked questions of Perry linking C.L.'s disdain for the salvage yard to bullying:

> Q. You heard Tari talk yesterday about the fact that [C.L.] had been bullied or what she perceived to be bullying at school?  A. Yes, I do.
> Q. And what was generally the focus of that bullying?  Was it money and clothing and—if you know?  A. Some of the kids teased her because we lived at a dirty salvage yard.  I could tell that bothered [C.L.]  She didn't— she didn't like—I think it was the teasing she didn't like.  She—to my knowledge she enjoyed being in the country.  But—yeah.  Being at the salvage yard was a problem for her.  The kids teased her often about it.

We think that counsel sufficiently investigated and elicited testimony about C.L.'s dislike for the salvage yard and its use as fodder for school-aged bullies.

But Perry's argument is not limited to counsel's inability to elicit testimony; he argues counsel was ineffective in failing to tie testimony into a defense strategy of undermining C.L.'s credibility and motive. But according to counsel, the decision not to explicitly question the child's credibility and motive was strategic; he thought questioning C.L.'s credibility would backfire:

> Q. So in any case, you had dismissed the idea of using character evidence against [C.L.]; is that correct? A. . . . When you depose people or you listen to their statements and whatnot, one of the things you do is you assess them for how they are going to appear in front of a jury. And she was very good, very effective. I thought she would be a very effective in that trashing her in some way with regard to that issue might be more counterproductive.
> Q. In what way? A. Well, to call her a liar on the witness stand, essentially, to have her mother say she was lying on the witness stand.

Instead, trial counsel emphasized C.L.'s testimony was uncorroborated at least four times during closing statements without outright calling the child a liar: "[W]e have Mr. VanDeKieft arrested two days later on the bare and uncorroborated allegation of a 13-year old girl." And, "So, what do they do? We've arrested him on the bare, uncorroborated allegation of a 13-year-old girl." Then, "There is no other evidence other than the bare and uncorroborated and inconsistent statement of a 13-year-old girl." Finally, "The best they can give you to prove the guilt of Perry VanDeKieft is the uncorroborated testimony of a 13-year-old girl who says that he touched her a thousand times between 2016—2014 and 2016."

In our view, counsel toed a thin line in trial—eliciting testimony that implied the child had a motive and ability to fabricate her allegation, including testimony about discipline and bullying, but leaving it up to the jury to make the connection. Counsel's

consideration of the impact of an explicit attack on the child's credibility is indicative of a experienced attorney. Having found no breach in duty, Perry's third claim fails.

## D. Cumulative Prejudice.

Perry's final argument on appeal concerns cumulative prejudice. He maintains that "[t]he three failures of duty demonstrated in the instant case are prime for the cumulative evaluation because they interlock in an overall picture of counsel's failure to present a cohesive story for the jury while also failing to protect Perry from an unfair attack on his character." "Iowa recognizes the cumulative effect of ineffective assistance of counsel claims when analyzing prejudice under *Strickland.* In other words, if [an applicant] raises multiple claims of ineffective assistance of counsel, the cumulative prejudice from those individual claims should be properly assessed under the prejudice prong of *Strickland.*" *State v. Clay*, 824 N.W.2d 488, 501 (Iowa 2012) (internal citation omitted). We did not find a breach of duty in any of the three claims of ineffective assistance raised by Perry. So, under the *Strickland* standard, none of the three claims, together or separately, may succeed. *See Ledezma*, 626 N.W.2d at 142 ("To prevail on a claim of ineffective assistance of counsel, the applicant must demonstrate both ineffective assistance and prejudice."); *see also Clay*, 824 N.W.2d at 501 ("If the defendant raises one or more claims of ineffective assistance of counsel, and the court finds trial counsel performed an essential duty in an individual claim, the court should dismiss that claim."). Because Perry failed to establish that he received ineffective assistance on any claim, he cannot establish cumulative prejudice.

**IV. Conclusion.**

Because Perry failed to prove his counsel was ineffective, we affirm the denial of his PCR application.

**AFFIRMED.**